82　306
163　533

82　306
181　24

82　　　306
19 SC [8] 93

82　　　306
207　[1]277

82　　　306
205　[4]103

## Rolland and Johnston *versus* The Commonwealth.

1. Where the jury-wheel was deposited in a vault in the county commissioners' office, in a locked chest, in the custody of the county commissioners' clerk, who was also the clerk of the jury commissioners, and the key was kept in a desk in the sheriff's office, to which his son, who was his deputy, had access and which was not always kept locked : *Held*, that this was a sufficient custody of the wheel in compliance with sect. 2 of the Act of 10th April 1867, and that the custody of the key was sufficient, although the evidence showed an improper want of care.

2. In the absence of positive evidence that one of the jury commissioners did not seal the wheel as required by law, the presumption is that he performed his legal duty.

3. It is no ground of challenging an array of jurors that the number of persons drawn was the minimum number, forty-eight, required by law, of whom only forty-five were summoned, two of the persons drawn being returned "not found" and a third returned as "dead," where the sheriff did not know at the time of drawing of the death or removal of those not summoned.

4. It is not a right of a defendant to have forty-eight jurors in actual attendance, in the Oyer and Terminer.

5. It is not a ground of challenge that the sheriff and jury commissioners did not destroy the slips containing the names of the jurors absent or dead, and draw others in their stead, where such absence or death was not known to them at the time of drawing.

6. The names of jurors exempted from service at a previous term were not returned to the wheel by the sheriff and jury commissioners at the time the jury in question was drawn, as required by sect. 135 of Act of 14th April 1834. *Held*, not to be a ground of challenge.

7. It is the duty of every officer to whom a writ is directed to make a return thereof; but a failure to do so, though irregular, is amendable even after a writ of error taken.

8. It is no ground for quashing an indictment for burglary, that two of the grand jurors were stockholders of the bank upon whose premises the burglary was alleged to have been committed.

9. A witness, who had given evidence tending to identify one of the defendants, was offered to prove that this defendant left a satchel at the witness' shop for repairs, to be followed by evidence of the subsequent finding of this satchel filled with burglars' tools. The counsel for the defendants at this stage claimed the right to cross-examine the witness as to his opportunities for knowing the defendant, which the court refused : *Held*, not to be error.

10. Obtaining an entry into a dwelling-house by fraud or artifice, with intent to commit a felony, is "constructive breaking."

11. The defendants, intending to gain an entry into a bank building to rob the bank, called in the evening at the cashier's house, which was in the rear of the bank, and asked for the cashier, saying that they wished to transact some private business with him. The cashier was not then at home, and they went away. They called again twenty minutes later, and were then shown into the cashier's office, without saying anything as to the pretended object of their visit. After a short interview with the cashier they assaulted him, and endeavored to carry off certain property of the bank. *It seems* that it should have been left to the jury to say whether the first call was made for the purpose of gaining an entrance by fraud with intent to commit a felony, and whether the second call was a part of the same transaction, in pursuance of such design, and from these facts, if so found, to find a constructive breaking.

12. There is no such thing in Pennsylvania as burglary without a breaking, either actual or constructive.

[Rolland *v.* Commonwealth.]

13. Where the defendant entered a dwelling at night without breaking, but with felonious intent, the mere unlatching or breaking of a door in an attempt to escape does not make the offence burglary.

14. Sect. 135 of the Act of 31st March 1860 defines the common-law offence of burglary, and the words "break *or* enter" should be read "break *and* enter." In sect. 2 of the Act of 22d April 1863, the words "with or" were not intended to apply to dwelling-houses.

June 9th 1876.　Before Agnew, C. J., Mercur, Gordon, Paxson and Woodward, JJ.　Sharswood and Williams, JJ., absent.

Error to the Oyer and Terminer of *Franklin county*: May Term 1876, No. 116.

Indictment for burglary.　The first count of the indictment was as follows:—

" That Ralph L. Rolland * * * and B. Johnston * * * on the 24th day of March in the year of our Lord 1876, about the hour of nine o'clock of the night of the said day, with force and arms at the county aforesaid, and within the jurisdiction of this court, the dwelling-house of one George R. Messersmith, there situate, feloniously and burglariously did *break and enter*, with intent the goods and chattels, moneys and property of the National Bank of Chambersburg, in the said dwelling-house, then and there being, from the presence and lawful custody of the said George R. Messersmith, then and there, feloniously and burglariously, and by force and violence, to *rob, steal*, take and carry away, contrary to the form of the Act of Assembly in such case made and provided, and against the peace and dignity of the Commonwealth of Pennsylvania."

The second count charged an *entering* with intent to *rob, steal* and take away, &c.　The third count, a *breaking* and *entering* with intent to *steal*, take and carry away; and the fourth count, an *entering* with intent to *steal* and carry away, &c.

The defendants, before pleading to the indictment, challenged the array of grand and petit jurors:—

1. Because the jury-wheel had not remained in the custody of the jury commissioners as required by law.

2. Because the sheriff and jury commissioners of Franklin county, at the time of the selecting and placing in the wheel the names of the jurors, did not secure the jury-wheel in the manner required by law, they having failed to secure the said wheel by sealing the same with their respective seals, the said wheel being sealed with only one seal, if any.

3. Because the keys of the said jury-wheel had not at all times been and remained uninterruptedly in the custody of the sheriff of the said county of Franklin.

4. Because the number of persons drawn to serve as petit jurors at that term of the Court of Oyer and Terminer was the minimum number, forty-eight, of which number only forty-five were

[Rolland *v.* Commonwealth.]

actually summoned, two of the persons named in the venire being returned by the sheriff of the said county of Franklin "not found," and another of the persons named in the venire being returned by the said sheriff as "dead."

5. Because the said sheriff and jury commissioners of the county of Franklin did not destroy the slips containing the names of the said absent or removed jurors, nor the slip containing the name of the said dead juror, and proceed to draw other names until the several panels were completed.

6. Because the prothonotary of the Court of Common Pleas and the clerk of the Court of Quarter Sessions and the Oyer and Terminer did not, nor did either of them, certify to the sheriff and jury commissioners of the said county at the end of the February Term 1876, the names of the jurors who appeared and served at the February Term of said courts. Also the names of those who made default, or were excused from serving as jurors at that term, and also the names of those who were privileged or exempt from serving on juries.

6½. Because the names of the persons selected, drawn, summoned and making default, also the names of the persons excused and exempted from serving as jurors at the February Term of the said Court of Common Pleas, Quarter Sessions and Oyer and Terminer, were not returned by the sheriff and jury commissioners to the wheel from which they were taken at the time of the drawing the names of the grand and petit jurors to serve and be summoned for the present term of the said courts, although such persons were resident within the said county of Franklin and competent and liable to perform the duties of a juror.

7. Because it did not appear from the return to the precept that the jurors were legally drawn, how they were drawn or that they were in fact drawn at all, nor did it appear from the record that they were legally summoned.

Evidence taken in support of the challenge.

John Sweney testified: "I am the sheriff of Franklin county; the jury-wheel has been in the vault of the commissioners' office. The wheel after being sealed up was put into a chest, the chest locked. My office is not in the commissioners' office; Mr. Etter lives four miles away; Mr. Gilbert fourteen miles away. They have nothing to do with the commissioners' office. They draw the jury there. I was present the last time the chest was locked up. I locked it. The jury commissioners were present. I think Mr. Nelson, the clerk to the county commissioners, was also clerk to the jury commissioners. I lock the chest. I have the key. It is down in my desk at the jail—at my office at the jail. We keep some papers and books there; the key is in a small drawer. My son James has access to the desk. People often come into the office. Any one who has business with me comes into that room. The desk is not

[Rolland v. Commonwealth.]

kept locked all the time.   The drawer where the key is is not kept locked.   The key of chest and key of wheel are on a ring and kept together.   Any one going into the room and to that desk could have access to those keys.   I have not seen the keys since the wheel was locked when the last jury was drawn.   They were so kept ever since I had anything to do with it.   No certificate of persons drawn, summoned, selected and making default, or the names of persons excused or exempted from serving as jurors at February Term 1876, was furnished to me by either the prothonotary or clerk.   No such list was furnished me for December Term 1875.   Before drawing the jury, grand and petit, for this present term, the jury commissioners and I did not return to the wheel the names of the jurors selected, drawn, summoned, and who made default, or the names of persons excused or exempted from serving at February Term 1876.   We did not do so prior to drawing the jury of December Term, or the February Term."

(Venire shown for the first week of this term in the Oyer and Terminer and Quarter Sessions.)

"This is the venire issued to me for summoning the jurors for this term.   This is the only writ put into my hands for the drawing and summoning of jurors in the Oyer and Terminer.   That panel contains forty-eight names.   My return is 'April 19th 1876, as commanded in the above writ, I have summoned and caused to be summoned the above named jurors.   So answers John Sweney, sheriff.'   This is the only return to the venire."

Cross-examined: "I have an office in the jail.   It is there I keep the keys in a desk.   The desk has not usually been locked.   I kept my books and papers in there.   I have no reason to regard it as insecure.   I have not looked for the keys lately.   Mr. Nelson is clerk to the jury commissioners.   I do not know that anybody else has been in the custody of the key of the wheel since it was locked—nor of the key to the chest—or has had it in possession.   So far as I know, the jury-wheel in the chest has been all the time in the vault of the commissioners' office.   So far as I have knowledge, no one has had access to the desk except myself and my son, and my son is my deputy.   At the time of drawing, I did not know that Huber and Lohr had removed from the county, nor that John McLaughlin was dead.   These facts were discovered when we went to serve the summons, a considerable time after the drawing was completed.   I have no reason to believe that anybody has had access to this wheel since it was locked.   I don't know however.   I have a seal.   Mr. Etter also has a seal.   My seal is on this wheel.   These impressions are not with same seal.   I know one of these is mine—the impression of my seal.   Two seals were there I think—that is my impression.   I impressed my seal on the corners of the paper."

Augustus Etter affirmed: "I am a jury commissioner.   The

[Rolland *v.* Commonwealth.]

jury-wheel has been kept in the office of the county commissioners, in the vault, on top of the cupboard. It has been in our possession at the filling of wheel and drawing, and the clerk of the county commissioners has always been the clerk to the jury commissioners. Mr. Nelson is at present clerk. He was sworn by the register and recorder as such clerk. I saw the oath administered. I don't know whether the oath was reduced to writing or not. This was at the time of his appointment, before he discharged the duties of the office. The certificate of jurors selected, drawn, summoned, and who made default, and those excused or exempted from service at February Term last, was not furnished to us by the clerk or prothonotary, and of course we did not return such names to the wheel. I don't know John Huber of S., nor Jacob Lohr, and I did not know till to-day that they were not residents of the county, nor did I know of the death of John McLaughlin. I affixed my seal on the wheel. The impression is that in the centre and one on corner below. I don't know whether Gilbert put any seal on or not. He was in the habit of using his watch—the stem of his watch—for a seal. (Seals shown.) One is mine—one is the sheriff's. Mr. Gilbert had a seal also. I don't know whether Gilbert used his seal this last time or not."

Cross-examined: "Mr. Nelson's place is the office of county commissioners. I meant it was not in our personal custody. We put it in the vault of the county commissioners' office for safe keeping, with their consent."

John A. Hyssong, sworn: "I am prothonotary. After February Term last, I did not furnish to the sheriff and jury commissioners the certificate of jurors summoned, and who made default, and were excused or exempted. I never did so."

W. Rush Gillan sworn: "I am clerk of Oyer and Terminer; entered in office first Monday of January. I did not, after the February Term last of court, furnish to sheriff and jury commissioners the names of jurors who were summoned and made default, or who were excused or exempted."

Defendants rested.

The Commonwealth offers "Jury Record." Record Book of Jury Commissioners showing the drawing of the jurors for this term, with the following certificate:—

"We, the undersigned jury commissioners and sheriff, do hereby certify that the foregoing panel of jurors were drawn by us according to law, at the county commissioners' office in Chambersburg, Wednesday, March 22d, A. D. 1876.

(Signed)          JOHN GILBERT, } Jury Commissioners.
                  A. H. ETTER,  }

Attest:

    T. M. NELSON, Clerk.          JOHN SWENEY, Sheriff."

To this the counsel for defendants objected, 1. Because it was irrelevant and immaterial.   2. It was not made a part of the venire, and did not purport to be a return to the writ of venire, and because the sheriff did not sign the record until within the last few minutes.

(It was admitted that the sheriff did not sign this record until a few minutes before it was offered in evidence.)

Objection overruled.   Evidence admitted under an exception.

The court below overruled the challenge to the array.   The defendants then moved to quash the indictment, for the reason given above for challenging the array of jurors, and also for the additional reason that two members of the grand jury were directors and stockholders of the National Bank of Chambersburg, upon whose premises the alleged offence was committed.   This motion was also overruled.   The defendants then pleaded "Not guilty."

At the trial, the following facts appeared in evidence : At the time the alleged offence was committed, Mr. Messersmith was the cashier of the National Bank of Chambersburg, and lived in a dwelling-house belonging to the bank and connected with the bank building.   On the night of March 24th 1876, the defendants rang the door-bell of his residence, and inquired for Messersmith, with whom they said they had some private business to transact.   The latter was not at home at that time, but returned home soon after. After his return the defendants called again and were shown into the cashier's office.   After a friendly conversation of about half an hour with Messersmith, they made a violent assault upon him ; he struggled desperately for some time, and finally succeeded in giving an alarm.   The defendants then left him and endeavored to escape, taking with them, however, a package belonging to the bank and containing $30,000.   Rolland was captured in the yard of the building, within a few minutes, and Johnston was captured the next day, in a neighboring town.

As to what occurred when the defendants obtained admission to Messersmith's house, Leonard B. Kindline, a witness called by the Commonwealth, testified in part as follows :—

"I reside with my brother-in-law, Messersmith.   I was in bank building of his dwelling on 24th March last.   I answered a bell call that night.   I was in the hall when the bell rang.   I opened the front door and Rolland and another were then outside.   It was dark, after night.   I did not know the other man.   Rolland asked whether Mr. Messersmith was in.   I said he was not, that he had just walked out.   He said he would like to see Messersmith, that he had a friend from New York who wanted to transact a little business with him.   He introduced his friend as Mr. Johnston. Then I said it was a disagreeable evening.   Rolland said 'I think we'll have some sleighing yet.'   He said 'Good evening. Perhaps will call later in the evening.'   He left.   I was at my room

about twenty minutes afterwards, and heard the bell ring again. I answered at the door. Same parties there. They asked if Mr. Messersmith was in. I said he was. They came in, and took off their hats and put them on the rack, and Johnston took off his overcoat and put it on the rack. They followed me through the hall and dining room into Messersmith's office. I took them into Messersmith's office, and he was sitting in front of register, with his back to the door. I said, 'Mr. Messersmith, several gentlemen want to see you.' Messersmith had no collar or cravat on. Rolland said to him, ' Mr. M. we have taken you unawares.' Mr. M. got up to receive them and I left, closing the door after me by pulling it to and latching it."

George R. Messersmith, after giving some evidence as to the locality of the occurrence and his previous acquaintance with Rolland, testified: " On that night, March 24th, I was in my cashier's office. About 8 o'clock my brother-in-law (Kindline) showed these men into my room. It was dark, and, as I recollect, it was snowing. It was about an hour after dark. After they came in, Rolland introduced Johnston to me as the gentleman about whom he had been speaking to me on several occasions in reference to the purchasing of Abram Stouffer's farm, adjoining mine. This was in the cashier's room. We had a conversation of twenty or twenty-five minutes' duration in reference to the value of the farm and the profits of farming generally. He requested me to give him the largest one of the two packages that he had left for safe-keeping. I said I could not give it to him that night, but that he could have it in the morning after seven o clock. He then asked me to take charge of a packet belonging to Johnston for safe-keeping, which I consented to do. (Package shown.) This is the package. He then again reverted to his desire to have his own package, and spoke of being hurried in the morning, and inquired if he did not get to the bank in time to get it, I would send it to him to New York by express. I agreed to do it and took the address to where I was to send it. After I had written that, he said that he believed he would have me send both packages, and as I wrote to send both and underscored it, I was suddenly seized, one hand on my mouth, another at my throat." After describing the struggle with the defendants, the witness proceeded: " At this time I was struggling, and they had their hands on me. The struggle continued till they left the room. I can't tell how long it was. I suppose it was fifteen or twenty minutes. I was struggling all the time, except for a little while, when I was insensible. I had on this occasion, when these men came there, valuables in the cashier's room. I had a packet of $30,000 in money. It was in my private drawer, in the cashier's room. (Envelope shown.) This is the envelope in which the money was enclosed. This was in the room when these men came in.

[Rolland *v.* Commonwealth.]

It was not there when these men escaped. I did not see either of them take it. I missed it as I staggered to my feet, and saw that my drawer was partly open, and the packet gone." * * *

John Ukkard testified that on the 24th March Rolland had engaged him to meet him (Rolland) with a horse, saddled and bridled, and a package of clothing, at a place agreed upon between them, about nine o'clock in the night.

G. S. Houser testified that on that same day Rolland had engaged a riding horse from him.

After much testimony relative to the attempted escape of the defendants and the capture of Rolland, John L. Black testified:—

"I occupy a room with Miller Shillito, who is a gunsmith. Johnston looks like a man I saw. I can't say positively. He resembles the man more than any other I have seen. My best judgment is that this is the man."

Counsel for the Commonwealth proposed to prove further by this witness that Johnston called at the witness' shop to have the lock of a satchel repaired (the satchel being produced), to be followed by evidence of what its contents were when found on the night of the 24th, after the alleged offence was committed, and near the bank.

Counsel for defendants claimed the right at this stage to cross-examine the witness as to his opportunities of knowing the man, and as to what constituted the basis of his opinion as to his identity, which was refused by the court, under exception. The counsel for the defendants then objected to further evidence until there was further and better proof of identification.

Objection overruled, and the witness proceeded: "Johnston is about the same size, about the same age, rather paler than he seems to be now. Did not notice his hair. He had a hat—slouch. I noticed a peculiar depression about the cheek bone, which peculiarity I observe in this man. There is a resemblance in the face. I see nothing else. He called there on two occasions. I see a difference between this man and the man I saw there. His mustache is heavier, larger, and nothing else. He has not a heavy mustache now, and as I recollect, if there was any hair on his face then, it was very little. He impresses me as being the man. I give that as my best judgment."

Counsel for Commonwealth proposed to follow this by proof that Johnston's mustache was then lighter than it was at the trial.

Counsel for defendants objected that the identification was not sufficient to allow the introduction of the proposed testimony, and objected to the introduction of any such evidence without further proof of identity.

Objection overruled, and the evidence admitted under exception.

[Rolland *v.* Commonwealth.]

Witness proceeded: " On Friday or Saturday afternoon of the week preceding the Friday when the attempt was made on the bank, the man called with a satchel to have the lock fixed, which he said was out of order. He asked to have it fixed. (Satchel shown.) This is the satchel. I identify it by some work that I put on it. I have no doubt at all about it. He called again and got it that evening or next day."

Cross-examined: " I had never seen Johnston before that. He came after dinner. I am not sure, and think no one else was in the room. He was there but a short time. He is ruddier now than then, not paler. His mustache is same. He had a hat of the general appearance of this shown. I can't say it was stiff or soft. He had his hat on all the time. I did not see the shape of his head. I do not swear positively that this is the man. I swear that he resembles the man more than any other that I have ever seen. My impression is that he had not a goatee on. He may have had. I can't say I could have remembered it. I do not remember the color of his eyes. I can't say with respect to his nose. I put in the rivets and centre-piece. I had to take the lock off. It is uncommon to put a centre-piece in. I can tell my own work."

Charles Ludwig was then called, and counsel for the Commonwealth offered to prove by him that the witness found the satchel under a wagon in an alley about seventy steps from the rear end of the bank lot, at about nine o'clock of the night of the 24th of the preceding March; to be followed by evidence of its contents.

Objected to, because immaterial and irrelevant, and because there was no evidence or offer of evidence to connect its possession with the defendants. The evidence was admitted, under exception.

John S. McIlvaine testified that the satchel had been brought to the bank on the morning of the 25th March, and had been in the custody of the bank ever since. He proceeded: " On night of 24th March I saw two hats there (this shown) and a high-crowned silk. This at 10 o'clock. Saw none of these articles in the banking-room that night. I opened the vault that night and went into it. I closed it that day at close of banking hours."

Counsel for defendants then proposed to ask the witness whether the vault had been opened between the time he opened it that night and the time he closed it that afternoon, in order to show whether he found it in the same condition when he opened as when he left.

This was objected to as not proper on cross-examination. The objection was sustained under exception, on the ground that the evidence was part of the defendants' case in chief.

John Berry testified to having found some burglar's tools, masks,

[Rolland v. Commonwealth.]

&c., in an alley near Messersmith's stable, very early on the 25th March. This was objected to, because the defendants were not shown to have been in possession of the articles, and because of the remoteness of the place at which they were found. The court admitted the evidence, under exception.

The counsel for the defendants offered no evidence, and for that reason claimed the right to close the summing up to the jury, which the court refused, and granted the defendants an exception.

Defendants' points and the answers thereto :—

1. Even if the jury believe all the evidence, the Commonwealth has failed to make out a case of burglary. The court refused this point, and charged, that the evidence, if believed, was enough to make out the offence of burglary, and further charged as follows :—

" It is felonious burglary by our statute, if any person shall, by night, wilfully and maliciously, enter into any dwelling-house, with an intent to rob and steal, or commit any felony whatever, whether the felonious intent be executed or not. The language of the statute is break *or* enter, not break *and* enter. So that an entrance, without a breaking, may be felonious burglary, according to the words of the statute."

2. If the jury believe from the evidence that the prisoners rang the door-bell at Mr. Messersmith's dwelling, and the door was opened by Leonard B. Kindline, then an usual and habitual inmate of the house, and that he escorted them and showed them into the cashier's room, where Mr. Messersmith was then sitting, and where the offence is alleged to have been committed against the property of the National Bank of Chambersburg, then alleged to be in his custody, these facts do not constitute such a breaking and entering as amount in law to the crime of burglary.

Answer: " This point is affirmed, and if there is no other evidence of a breaking, then the defendants cannot be convicted on the first and third counts in the indictments, which charge a breaking as well as an entering. For, although there is evidence to show that the defendants alleged business to be their object, when they first called and were met at the door by Mr. Kindline, yet that they were not then admitted, but were admitted twenty minutes or so afterwards, upon no pretence. So that there was no fraud in them, which the law could regard as equivalent to a breaking, in the manner in which they obtained admittance into the house.'

3. There is no such evidence of fraud or trick practised by the prisoners to gain admission into the house, at the time they actually did enter it, even if all the testimony in the case is believed by the jury, as makes the entry of the prisoners a burglarious entry.

Answer: " This point is not affirmed. There is not such evidence of fraud or trick practised by the prisoners to gain admission into the house as will constitute a breaking, but the entry of the prisoners may have been a burglarious entry, without breaking, as we have already said."

[Rolland *v.* Commonwealth.]

4. Even if the jury should believe from the evidence, that after the alarm was made, and pursuit of the prisoners commenced, they retreated through the kitchen, unlatching the door and passing out, these facts do not amount in law to such a breaking and entering as will justify the jury in convicting the prisoners of burglary.

The answer of the learned judge was: "The fourth point is refused. I instruct you to the contrary, that if the prisoners retreated through the kitchen, unlatching the door and passing out, these facts do amount in law to a breaking."

5. If the jury believe from the evidence that the passing out of the house by the prisoners was as described in the fourth point, and this is the ground upon which the alleged offence is claimed to be burglary, the Commonwealth was bound to so state in the indictment, and having failed to do so, there can be no conviction on the present indictment.

"This point is refused. A breaking out of a dwelling-house by one who entered it by night with intent to commit a felony, is burglary at common law, and the Commonwealth were not bound to state a breaking out in the indictment, but a breaking only, and there may be a conviction on this indictment, as well on the first and third counts, which charge a breaking, as on the second and fourth, which do not, but charge an entry only, for I have said that entering without breaking is enough."

7. If the defendants are shown by the evidence to be guilty of any crime at all, it is the offence defined in the second section of the Act of April 1863, and not burglary, and there can be no conviction of that offence, there being no count in the indictment charging that offence.

Answer: "This point we refuse to affirm. The second section of the Act of April 1863 was intended to punish and provide for the breaking and entering of a dwelling-house by day-time, and of other buildings by night. Any other reading of this section makes it cover what was burglary at common law, which was not the legislative intention."

Verdict as to both defendants of "guilty in manner and form as they stand indicted."

After sentence passed the defendants took this writ of error and made the following assignments of error: That the learned judge erred (1) in overruling the challenge to the array of grand and petit jurors and in disallowing the reasons therefor; (2) in overruling the motion to quash the indictment and in disallowing the reasons therefor; (3) in refusing to allow cross-examination of the witness, Black, and in admitting his testimony; (4) in admitting the evidence of Ludwig; (5) in ruling out the question to the witness McIlvaine as above set forth; (6) in admitting the evidence of Berry; (7) in admitting the "jury record" in evidence; (8) in refusing to allow the counsel for the defendants to close the case to

[Rolland v. Commonwealth.]

the jury; (9 to 13 inclusive) in refusing to charge as requested in the defendants' first five points respectively; and (14) in refusing to charge as requested in the defendants' seventh point.

*J. McD. Sharpe* (with him *Duncan & McGowan*), for plaintiffs in error.—(1.) Error in disallowing the challenge to the jurors. The Act of 10th April 1867 requires that the "jury wheel locked shall remain in the custody of the jury commissioners and the keys thereof in the custody of the sheriff of the county." The jury commissioners had neither actual nor constructive custody of the jury wheel. They ought to have kept it under their *exclusive* control, even if not in their *actual* custody. The key of the wheel was accessible to strangers at all times. It is not necessary to show that the jury wheel has actually been interfered with (Brown v. Commonwealth, 23 P. F. Smith 322), it is enough to show that the statutory requirements were not fulfilled. It did not appear that both of the commissioners sealed the wheel as required by law. The provisions of sect. 119 of the Act of 14th April 1834 were wholly disregarded.

Foust v. Commonwealth, 9 Casey 338, relied upon by the court below, is not the same case; here only thirty-five jurors were summoned, and no effort was made to fill the panel as required by law. No certificate was made out of jurors who had served or of those excused, exempted, &c., from duty, as required by sect. 128 of Act of 14th April 1834; nor were their names returned to the wheel as required by sect. 135.

Further, sects. 118, 123 and 125, of the Act of 1834, *supra*, provide that the sheriff and commissioners shall draw the names from the wheel and also that the sheriff shall summon the persons drawn. Here are two distinct and independent duties; there ought therefore to have been two separate returns; one that the jurors were lawfully drawn, and the other that they were lawfully summoned. In Eaton v. Commonwealth, 6 Binn. 447, where the record showed that the jurors were summoned, but did not show that they were drawn, judgment on a verdict of guilty was held bad.

(2.) Error in refusing to quash the indictment. As to the fact that two of the grand jurors were stockholders of the bank, the defendants raised the objection as soon as they could; having in view a change of venue under the statute, they could not object to the grand juror without waiving their rights under that statute. They made the objection before pleading and arraignment and while the grand jury was still in session. In Doyle v. State of Ohio, 17 Ohio 222, and Huling v. Same, 17 Ohio St. 588, the objection was raised by a plea; State v. Rockafellow, 1 Halst. 340, in arrest of judgment, was based upon a statute. Commonwealth v. Smith, 9 Mass. 109, was qualified in Hammett v. Bassett, 2 Pick. 563; Commonwealth v. Clark, 2 Browne 325; 1 Whart. Cr. L. 472.

[Rolland *v.* Commonwealth.]

(3.) Error in admission of evidence.    There was no evidence to connect either of the defendants with the satchel found by Ludwig or its contents, or with the tool found by Berry; such being the case, the finding of these articles near the bank was not material to the issue : Commonwealth *v.* Wilson, 2 Cush. 590 ; People v. Larned, 3 Seld. 445; Ruloff *v.* The People, 45 N. Y. 213 ; Hall *v.* People, 6 Parker 671; State *v.* Wisdom, 8 Porter 511; State *v.* Whittier, 8 Shep. 341 ; Kinchelow *v.* State, 5 Humph. 9 ; Williams *v.* State, 45 Ala. 57.

(4.) Error in answers to points.    The word " or" (break or enter) in sect. 135 of the Act of 1860 must be construed " and;" otherwise sects. 135 and 136 define the same offence and provide different penalties for them.    This is frequently done in construing statutes : Murray *v.* Keyes, 11 Casey 384 ; Bollin *v.* Shiner, 2 Jones 205 ; Dwar. on Stat. 772.    An entry *without breaking* is a felony under sect. 136 : Hollister *v.* Commonwealth, 10 P. F. Smith 105.    The " breaking out " of a dwelling-house was not burglary at common law ; the statute of 12 Anne, which made it so, has never been in force here : 4 Blacks. (Sharswood) *227 ; 2 Bish. Cr. L.; sect. 105 ; 2 Whart. Cr. L., sect. 1546 ; Commonwealth *v.* Strupney, 105 Mass. 588 ; State *v.* McPherson, 2 Green Cr. L. R. 737 ; Foster *v.* Commonwealth, 8 W. & S. 77.

(5.) Error in not allowing defendant's counsel to sum up. 3 Whart. Cr. L., sect. 3011, shows that this is the practice.

*O. C. Bowers,* District Attorney (with him *Kennedy & Stewart*), for defendant in error.—The law places a joint responsibility upon the sheriff and the commissioners.    The evidence shows that both wheel and key were in proper custody.    The defendants below did not show affirmatively that the wheel was not sealed according to law.

It is not necessary that the whole forty-eight should be summoned : Rex *v.* Hunt, 4 B. & Ald. 430; Foust *v.* Commonwealth, 9 Casey 339 ; Sparks *v.* Plankinhorne, 4 Yeates 384.    The absence or removal of any of the jurors was not known to the officers; it was therefore not possible for them to destroy the slips and draw other names.    Again, the provisions of the law, which require the prothonotary to certify to the sheriff, &c., the names of jurors who have served, &c., and which require the sheriff, &c., to return to the wheel names of those excused, defaulting, &c., are only meant to secure a uniform distribution of jury duty, not to protect the accused : Friery *v.* People, 2 Keys 424; Ferris *v.* People, 35 New York 125.

As to the return to the precept.    The Act of 14th April 1834, provides for but one writ, and the return to it is to be made only by the sheriff.    The return in this case was erroneous, but it is amendable : Dewar *v.* Spence, 2 Whart. 221.    Stainer *v.* James,

[Rolland *v.* Commonwealth.]

Cro. Eliz. 311, shows the distinction between an insufficient return which is amendable and an *album breve.* See also Commonwealth *v.* Smith, 2 S. & R. 303; Commonwealth *v.* Chauncey, 2 Ashm. 99.

The grand jurors who were stockholders of the bank were not disqualified; the offence was against the real estate, not against the bank: Treasurer of Middleton *v.* Ames, 7 Verm. 166. The defendants could only have taken advantage of this before bill found: Commonwealth *v.* Smith, 9 Mass. 107. They knew of the supposed disqualification before they were indicted: Hubert *v.* Shaw, 11 Mod. 111.

By excluding the words "dwelling-house" from the purview of the word "same" in the second clause of sect. 136 of the Act of 1860 (amended by the Act of 1863), sects. 135 and 136 can be harmonized. Then sect. 136 provides against entering a dwelling-house *in the day time* with or without breaking, with intent, &c., and the entering *other buildings* either by day or night with or without breaking, with intent, &c., and imposes a lighter penalty upon these offences. This section also shows that the legislative mind made no distinction between entering *by* breaking and *without* breaking. Even if " or" is construed " and" in sect. 135, yet two of the counts charge breaking *and* entering and the jury found a verdict on all of the counts.

The question of summing up to the jury is one of practice, not of right: Whart. Cr. L., sect. 3011, note *r.* Even if the court below was in error, this would not warrant a new trial, in cases of clear guilt: Hunt *v.* State, 49 Ga. 255; s. c. 2 Gr. Cr. R. 587; People *v.* Fenwick, 45 Cal. 287; s. c. 2 Gr. Cr. R. 218.

Mr. Justice PAXSON delivered the opinion of the court, October 23d 1876.

This cause was contested step by step in the court below, and pressed with marked zeal and ability here. The Commonwealth was met at the threshold of its case with a motion to quash the array of grand and petit jurors, and also to quash the indictment. Both motions were overruled, and this action of the court below forms the subject of the first and second specifications of error. We will consider briefly the reasons assigned in support of these motions respectively. It was urged that there was irregularity in regard to the custody of the jury-wheel, the sealing of the same, and in the manner in which the keys were kept. It appears from the evidence taken in support of the challenge to the array, that the wheel was deposited by the jury commissioners in the vault of the county commissioners' office, after being first placed in a chest, and the chest locked. The clerk of the county commissioners was also the clerk of the jury commissioners, and was duly sworn. It was therefore in the actual charge of their own sworn officer. After the drawing of the jurors for the February Term, the sheriff and one at least of the jury commissioners sealed the wheel. The other jury commissioner was not sworn. The sheriff says: "I have a

[Rolland *v.* Commonwealth.]

seal. Mr. Etter has also a seal. My seal is on this wheel. These impressions are not with the same seal. Two seals were there, I think—that is my impression." It also appeared that the sheriff kept the key of the wheel in his desk at his office, to which his son, who is also his deputy, had access. The desk was not kept locked all the time. The second section of the Act of 10th April 1867, Pamph. L. 62, provides, that "the said jury-wheel, locked as now required by law, shall remain in the custody of the said jury commissioners, and the keys thereof in the custody of the sheriff of said county." We must give this section a reasonable interpretation. It does not designate where the wheel shall be kept, and provides no place in which the jury commissioners may deposit it. It was not intended that they should carry it to their private residences. In many instances they reside several miles from the county seat. Its removal from the seat of justice would be as inconvenient as unnecessary. It is difficult to see what better disposition these commissioners could have made of the wheel than to deposit it in a vault attached to one of the public offices, where it was under the immediate charge of their own sworn officer. It was clearly in their custody within the meaning of the law. The objection that the wheel was not properly sealed is not made out by the proof. The onus was upon the party making the challenge, and it has not been sustained. In Brown *v.* Commonwealth, 23 P. F. Smith 322, there was proof that the wheel was not sealed as required by law. Here there was positive proof that the sheriff and one commissioner did seal, and no proof that the other did not. It was the duty of the plaintiffs in error to have called the other commissioner. That he also sealed is probable from the testimony of the sheriff. In the absence of any negative proof the presumption is that his duty in this respect was properly performed. The sheriff had the custody of the key. In that the law was complied with. We think, however, that it was carelessly kept. Officers charged with such delicate duties cannot be too exact in the performance of them. A prudent regard for the public interest requires that the key of the jury-wheel should be kept where it is not accessible to any one but the person charged with its custody.

We do not see much force in the further objection that the minimum number of an Oyer and Terminer panel, viz. : forty-eight, were not in point of fact summoned. One of the names drawn from the wheel was returned by the sheriff "not found," and one as "dead." This of course reduced the panel to that extent. Sect. 113 of the Act of 14th of April 1834, Pamph. L. 39, requiring forty-eight jurors to be summoned and returned as petit jurors in the Oyer and Terminer, must be read in connection with sects. 118, 119 and 125 of said act. Sect. 113 refers to the venire, and the manifest meaning of it is that the venire shall require that at least forty-eight jurors shall be drawn. Sect. 118 provides that so

[Rolland v. Commonwealth.]

many persons shall be drawn as shall be required by the writ of venire. By sect. 119 the slips containing the names of persons removed or dead are to be destroyed and other names to be drawn in their stead until the panels are complete. This of course means where the death or removal of the persons whose names are drawn was known to the sheriff and commissioners at the time of the drawing. The 125th sect. provides that the sheriff shall summon at least ten days before the return day of the venire the persons whose attendance shall be thereby required. Taken together we do not think that these provisions of the Act of 1834 require more than that forty-eight names shall be drawn from the wheel, and that in the absence of any knowledge at the time that any of the persons whose names are so drawn are dead or removed, the sheriff shall summon so many thereof as can be found within the county. This we believe has been the practice generally throughout the state, and is entirely consistent with Foust v. Commonwealth, 9 Casey 338. In that case forty-eight persons were summoned, but one of them was disqualified by reason of not residing within the county and being an alien. He was therefore not a juror and of no more service than the persons returned by the sheriff in this case as "not found" and "dead." It is not a right of a defendant to have forty-eight jurors in actual attendance in the Oyer and Terminer. If all are summoned and attend, the court may excuse some of them, and this cannot be assigned for error: Jewell v. Commonwealth, 10 Harris 94. Nor can a defendant be prejudiced thereby. It does not impair his right of challenge. He has a right to his peremptory challenges and as many more as he can show cause for, while special venires are provided by law in case the panel should be exhausted. It was clearly no ground of challenge that the sheriff and jury commissioners did not destroy the slips containing the names of the jurors absent or deceased, and draw others in their stead. It does not appear that such death or absence was known to either the sheriff or jury commissioners when the names were drawn. There was therefore no omission of duty on their part. Nor do we see any force in the further objection that the names of persons exempted at the February Term from serving as jurors were not returned to the wheel at the time the present panel was drawn. The 135th sect. of the Act of 14th April 1834, Pamph. L. 364, provides that " the name of every person selected, drawn, summoned and making default as aforesaid ; also the name of every person who shall be excused from serving, shall be returned by the sheriff and commissioners to the wheel from which it was taken at the time of the next drawing from the said wheel for any of the courts of such county," &c. This duty was neglected. The names were not returned to the wheel as they should have been. But we are unable to see how the defendants were injured by this omission. It is a matter of which they have no right to complain. This section

1 NORRIS—21

[Rolland *v.* Commonwealth.]

of the Act of 1834 was intended to secure equality in the performance of jury duty, and was not for the purpose of keeping the names in the jury wheel for the benefit of defendants. They have no such right. Otherwise a person who should be tried at the commencement of the year would possess superior advantages over those tried at its close when the wheel is comparatively empty. It was urged, however, that the array should be quashed because " it does not appear from the return to the precept that the jurors were legally drawn, how they were drawn or that they were in fact drawn at all. Nor does it appear from the record that they were legally summoned." I have examined the record with some care, and it discloses no return to the venire by the jury commissioners. This is certainly an irregularity. It should appear from the record that the names of the panel were drawn from the wheel in the manner required by law. This can only appear by the return of the sheriff and jury commissioners. It is true the Act of Assembly does not require the jury commissioners to return the venire. But this is a common-law duty, and needs no legislative command. It is the duty of every officer to whom a writ is directed to make return of the manner of its execution, and such return is the appropriate evidence of that fact. This omission could and ought to have been supplied in the court below as soon as its attention had been called to it by an order upon the jury commissioners to return the venire. It was but an amendment of the record, and a record may be amended even after writ of error or certiorari lodged in the office: In re Election of Sheppard, 27 P. F. Smith 297. Serious as this irregularity is we would hesitate to reverse upon this ground, especially in view of the Act of 21st of February 1814, 6 Sm. Laws 11, Br. Purd. 388, pl. 56, and the construction which said act received in Dyott *v.* Commonwealth, 5 Whart. 67. The error is more formal than substantial, and the court below appears to have had such evidence before it as satisfied its conscience that the law had been complied with in all important particulars. Yet as this judgment must be reversed for other reasons it is proper to call attention to what we regard as a loose and careless practice.

What has been said applies as well to the motion to quash the indictment as to the challenge to the array. In support of the former motion, there was, however, the additional reason that two of the grand jurors were stockholders in the National Bank of Chambersburg. This was no ground to quash the indictment. It might have been a ground of challenge as to the particular jurors. It is well settled that a grand juror may be challenged for cause. This is the current of the English authorities. It was allowed in this country in the trial of Col. Burr, and in this state in an Oyer and Terminer case tried before Tilghman, C. J., and Breckinridge, J., in 1814, 2 Browne 323.

We see no merit in the third specification. The witness, John

[Rolland v. Commonwealth.]

L. Black, had sufficiently identified the defendant Johnston to permit his statement in regard to the satchel to go to the jury and it was not competent for the defendants' counsel to interrupt the examination in chief at this point in order to inquire into the opportunities of the witness of knowing Johnston. Such cross-examination was competent, but not at that particular time. The fourth, fifth and sixth specifications are also without merit and need not be discussed. The admission of the "jury record," referred to in the seventh specification, was of doubtful propriety, as it was not sworn to, and does not appear to have been kept in pursuance of any Act of Assembly. The offer was to the court, not to the jury, and is unimportant. The eighth specification is wholly unsustained. The order in which counsel shall sum up is in the discretion of the court below, and is not assignable for error. The learned judge was right in declining to affirm the defendants' first point, referred to in the ninth specification. The evidence for the Commonwealth, if believed by the jury, was sufficient to make out the offence of burglary, either at common law or under the statute.

There was error in the answer to the defendants' second point, embraced in the tenth specification, but it was in their favor. They have, therefore, no cause of complaint. We might well stop here, but as this case must go back for another trial, we deem it our duty to indicate the principles upon which this branch of it should be ruled. It is established by numerous authorities that there may be a constructive breaking. This may be done by an act *in fraudem legis*, or by fraud not carried on under cloak of legal process. Accordingly it has been held, that where thieves came to a house in the night-time, with intent to commit a robbery, and knocking at the door, pretending to have business with the owner, and being by such means let in, robbed him, they were guilty of burglary : Le Molt's Case, Kel. 42 ; 2 Hawk. P. C. 131 ; 1 Russell on Crimes 793 ; 1 Hale P. C. 552 ; 2 Arch. Cr. Law 279. The evidence for the Commonwealth upon this point was that the defendants (plaintiffs in error) came to the door of Mr. Messersmith's house, after dark, on the evening of the 24th of March last. The witness Kindline says : "I opened the door, and Rolland and another man were outside. * * * I did not know the other man. Rolland asked whether Mr. Messersmith was in. I said he was not, that he had just walked out. He said he would like to see Messersmith ; that he had a friend from New York who wanted to transact a little business with him. He introduced his friend as Mr. Johnston. * * * He said ' Good evening. Perhaps we will call later in the evening.' " They did call about twenty minutes afterwards, rang the bell and were admitted by Mr. Kindline. Messersmith had returned, and they were shown into his room. Rolland introduced Johnston as the man of whom he had previously been speaking to Messersmith in regard to the purchase of a farm. Some other conversation

[Rolland *v.* Commonwealth.]

occurred in reference to matters of alleged business, when Mr. Messer-smith was suddenly seized and the robbery attempted. There was evidence here to go to the jury of a constructive breaking; of a trick and a fraud by means of which the defendants had obtained admission to the house. The learned judge of the court below evidently regarded the first attempt to enter as a trick, but held that inasmuch as they did not obtain admission then, but went away and returned in the course of twenty minutes, and were admitted without any further reference to their pretended business, such entry was not a constructive breaking. This was error. It was for the jury to say whether upon all the evidence they believed the first call at Mr. Messersmith's house was for the purpose of gaining admission by fraud and artifice, with intent to commit a felony there-in; and whether the second call, when they actually obtained ad-mission, was a part of the same transaction in pursuance of such previously formed design.

The learned judge was right in refusing to affirm the prisoners' third point. But it was error, as has already been stated, to say that there "is not such evidence of fraud or trick practised by the the prisoners to gain admission into the house as will constitute a breaking." It was also error to say, in the same sentence, that "the entry of the prisoners may have been a burglarious entry with-out breaking." There is no such thing as burglary in Pennsylvania without a breaking, either actual or constructive. We shall refer to this more fully when we come to the last assignment of error.

The answer to the fourth point was error. The mere unlatching or breaking of a door in an attempt to escape is not burglary in this state. We do not think it was ever so at common law. It is true it was at one time asserted to be so by Lord Bacon and other emi-nent English lawyers, but it was denied by authority of equal weight; notably by Sir Mathew Hale, by Lord Holt and by Trevor, C. J., in Clark's Case, 2 East P. C. Ch. 15; in 1 Hale 554, where it is said: "If a man enter in the night-time by the doors open, with the intent to steal, and is pursued, whereby he opens another door to make his escape, this, I think, is not burglary, for *fregit et exivit non fregit et intravit.*" And see Black. Com., vol. 4, p. 223. This difference of opinion among eminent jurists in England led to the passage of the Statute of 12 Anne, which, after referring to the doubt on the subject, provides, that a breaking out of a dwelling-house by a burglar in the night-time, in an attempt to escape, was a sufficient breaking to sustain a conviction. This statute was subse-quently repealed by the statute of 7 & 8 Geo. 4, ch. 27, and re-enacted by 7 & 8 Geo. 4, ch. 29. The passage of the Act of 12 Anne is strong evidence that it was not the common law. No such statute was ever enacted in Pennsylvania, and I am not aware of any decision recognising such a rule here. In the fifth report of the English commissioners on criminal law, we find the following

[*Rolland v. Commonwealth.*]

remarks on burglary, which are so forcible, and bear so directly upon this point, as to justify their admission here: "By the statute of 12 Anne, ch. 1, § 7 (subsequently repealed and re-enacted), the crime of burglary was extended to the case of an offender who, having committed a felony in a dwelling-house, or having entered therein with intent to commit a felony, afterwards broke out of such dwelling-house in the night-time. This extension does not, we think, rest upon just principles. After a felony has been committed within the dwelling-house, the offence is not in reality aggravated by lifting the latch of a door, or the sash of a window, in the night-time, in order to enable the offender to escape. A breaking out, indeed, may be an innocent act, as it may be committed by one desirous of retiring from the further prosecution of a crime, and the extension of the law of burglary to such a case is not warranted by the principles upon which the law is founded, inasmuch as a circumstance not essential to the guilt of the offender, or the mischief of the act is made deeply essential to the crime. It is ineffectual, even with a view to the object proposed; the pretext for the conviction fails in the absence of a breaking out, which is a casual and uncertain circumstance."

The thirteenth and fourteenth specifications raise a question that is not free from difficulty. It was not error to refuse to affirm the defendant's seventh point for the reason that two of the counts of the indictment charge the offence of burglary at common law, to wit: the breaking and entering a dwelling-house in the night-time with the intent to commit a felony. But the case requires from us a construction of the 135th section of the Act of 31st March 1860, Pamph. L. 415, and of the second section of the Act of 22d April 1863, Pamph. L. 531. The first-named act provides that "if any person shall by night wilfully and maliciously break *or* enter into any dwelling-house  *  *  *  with an intent to commit any felony whatever, whether the felonious intent be executed or not, the person so offending shall, on conviction, be deemed guilty of felonious burglary," &c. It will be seen that, by the terms of the act, an entry *without breaking*, in the night-time, constitutes felonious burglary. Then came the Act of 1863, before mentioned, which provides that, "if any person shall in the day-time break and enter any dwelling-house,  *  *  *  or wilfully and maliciously, either by day or by night, *with or without breaking*, enter the same with intent to commit any felony therein, the person so offending shall be guilty of felony," &c. I have given so much of each act as relates to dwelling-houses. The learned judge of the court below held that the Act of 1863 was "intended to punish and provide for the breaking and entering a dwelling-house by day-time, and of other buildings by day or by night. Any other reading of this section makes it cover what was burglary at common law, which was not the legislative intention." The Act of 1863 is an exact

rescript of the 136th section of the Act of 31st of March 1860, with the exception that the words "with or" are interpolated so as to make it read "wilfully and maliciously, either by day or by night, *with or* without breaking, enter the same," &c.   That the 136th section of the Act of 1860 was intended to apply to cases where the breaking takes place in the day-time, or there is an entry by day or night without breaking, with intent to commit a felony, is manifest.   This was the view taken of it by this court in Hollister *v.* Commonwealth, 10 P. F. Smith 105.   But the Act of 1863 supplied the aforesaid section of the Act of 1860, and extends to an entry by night, with or without breaking.   Then as to the 135th section of the Act of 1860.   By its terms it makes an entry at night, with or without breaking, felonious burglary.   If we construe this act literally, it is supplied by the Act of 1863, and the crime of felonious burglary no longer exists by statute in this state.   The offence is reduced to the grade of an ordinary felony, punishable by four years' imprisonment.   For it is impossible for two statutes defining exactly the same offence, the one punishing it as felonious burglary, and the other as a simple felony, to stand together.   Under which statute shall a prisoner be sentenced ?   How shall he be tried ?   In the Quarter Sessions, or the Oyer and Terminer ?   These are matters that must not be left to conjecture, to be guessed at upon the trial, or decided upon the caprice of the judge.   It is therefore our duty to put such a construction upon these statutes as will most effectually carry out the legislative intent, and produce a consistent and harmonious system.   In view of all this legislation, we have no doubt it was the intention of the legislature, by the 135th section of the Act of 1860, to define and punish the common-law offence of burglary, and that the word "or" in said act, "break *or* enter," was introduced by mistake or inadvertence; for the succeeding section (136) of said act proceeded to punish the offence of entering a dwelling-house in the night-time without breaking.   It is made a lighter offence, a simple felony, punishable by four years' imprisonment.   To read the 135th section, therefore, to break *or* enter, is inconsistent with the 136th section.   We are therefore led to the conclusion that the word "or" in the 135th section should be read "and," which would make the offence that of burglary at common law.   Such a mode of construing a statute is not without precedent.   It was done by this court in Murray *v.* Keyes, 11 Casey 334; Bollin *v.* Shiner, 2 Jones 205; Foster *v.* Com., 8 W. & S. 77.   It is said in Dwarris on Statutes 772, that "'and' is not always to be taken conjunctively. It is sometimes, in the fair and rational construction of a statute, to be read as if it were 'or,' and taken disjunctively and distributively."   Giving to the 135th section of the Act of 1860 the construction we have indicated, it harmonizes perfectly with the 136th section of the same act so far as relates to dwelling-houses;   the former punishing as felonious burglary the

[Rolland *v.* Commonwealth.]

common-law offence of breaking and entering a dwelling-house in the night-time with intent to commit a felony, and the other punishing a lesser offence, partaking of the nature of burglary, viz., when the breaking takes place in the day-time, or there is an entry by day or by night without breaking. Then we have the Act of 22d of April 1863, the 2d section of which interpolates the words "with or" into the 136th section of the Act of 1860, yet in all other respects leaves the latter act intact. What was the legislative intent in the Act of 1863? Was it intended that the words "with or" should apply to dwelling-houses? The whole subject was completely covered by the legislation contained in the 135th and 136th sections of the previous Act of 1860. They provide for, 1st, breaking and entering by night; 2d, breaking and entering by day; and 3d, entering by day or by night without breaking. There was therefore no reason why the words "with or" should be applied to dwelling-houses, but on the contrary ample reasons why they should not. It will be observed that the 136th section, with the single exception of dwelling-houses, relates to a class of buildings entirely different from those embraced in the 135th section. As to such buildings it is not difficult to see why the legislature enlarged the offence by the Act of 1863 so as to make it the entering, either by day or by night, with or without breaking.

We are of opinion that as to the 135th section, the word "or," must be read "and," and that the words "with or" in the second section of the Act of 22d April 1863, were not intended to apply to dwelling-houses. This construction makes the legislation referred to a consistent and harmonious whole.

We are not surprised, in view of the wording of the 135th section of the Act of 1860, that the learned judge of the court below instructed the jury in answer to the defendant's fifth point, that there could be a conviction under the counts which charged an entry without breaking. But under the construction which we have placed upon said section, it was error.

The judgment is reversed and set aside, and the record remitted to the Oyer and Terminer for another trial. And it is further ordered that the inspectors and warden of the Eastern Penitentiary, at the city of Philadelphia, surrender the bodies of Ralph L. Rolland and B. Johnston, the plaintiffs in error, to the high sheriff of Franklin county for custody and trial in due course of law.