436 A.2d 1165

Edward P. ZEMPRELLI, J. William Lincoln, Robert J. Mellow, James E. Ross and Eugene F. Scanlon, State Senators, Petitioners,

v.

LeGree S. DANIELS, Robert C. Jubelirer, F. Joseph Loeper, Senate of Commonwealth of Pennsylvania, Intervenors

**and**

Florence J. Baals, Ernesta D. Ballard, H. Edward Black, John C. Goebert, Ezra M. Miller, Mark Neal Platts, William L. Pollard, Joseph V. Zord, Jr., Nelson Page Aspen, M.D., Anthony R. Cognetti, Elizabeth J. Harper, Earl Horton, Joseph T. Marconis, M.D., Dennis E. McMaster, John H. Moyer, III, M.D., D.Sc., John Wilson Stemler, and Clifford Tinklepaugh, Respondents.

Supreme Court of Pennsylvania.

Argued Sept. 17, 1981.

Decided Oct. 28, 1981.

248

Michael T. McCarthy, Senate Democratic Caucus, Harrisburg, for petitioners.

Allen C. Warshaw, Harrisburg, for respondents.

Thomas L. Wenger, Harrisburg, for intervenors.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

Petitioners in the instant action are five state senators who voted against the confirmation of Respondent Daniels as a member of the State Tax Equalization Board. Other respondents include 17 other successful nominees. Two state senators who voted to confirm respondents' appointments and the Senate of the Commonwealth of Pennsylvania have been granted leave to intervene. Invoking our original jurisdiction pursuant to 42 Pa.C.S.A. § 721(3) (Purdon 1981), petitioners filed a Petition for Review in the Nature of Quo Warranto seeking to oust Respondent Daniels from her seat. Similar actions were filed against the other respondent nominees, and our decision in the initial action will be dispositive as to those as well. Having considered the matter presented in the petition, we uphold the validity of the challenged executive appointments and accordingly deny the relief requested by petitioners.

The events giving rise to this action, which are not in dispute, took place on the Senate floor during the 1981 Session of the 165th General Assembly. Governor Thornburgh nominated Respondent Daniels by a letter to the

Senate dated December 24, 1980. Initially, the nomination was tabled, but it was reconsidered on January 27, 1981, when a vote was taken. The affirmative votes of a majority of the members elected to the Senate were required to confirm her appointment under 71 P.S. § 67.1(d)(4) (Purdon Supp. 1981). The nomination received 25 "yeas" and 22 "nays," and the President of the Senate, finding that the requisite vote of a constitutional majority had been obtained, ruled the appointment confirmed.

Respondent's Zemprelli objected to the Chair's ruling, arguing that the constitutional majority should be computed on the basis of the total number of members "elected" to the Senate, 50, rather than on the number then in office, 48,[1] and that consequently the affirmative vote of 25 senators was insufficient to seat Respondent Daniels. The President based his ruling on Senate Rule XXII, subparagraph 8, 104 Pa.Code § 11.22(i), which provides "[a] majority of the Senators elected shall mean a majority of the Senators elected, living, sworn, and seated." Since 25 constituted a majority of the 48 senators then in office, the President ruled that Respondent Daniels' nomination had achieved the majority vote mandated by Article IV, section 8(a) of the Pennsylvania Constitution. That section provides:

"The Governor shall appoint a Secretary of Education and such other offices as he shall be authorized to appoint. The appointment of the Secretary of Education and of such other officers as may be specified by law, shall be subject to the consent of two-thirds or a majority of the members elected to the Senate as is specified by law.

Petitioner Zemprelli appealed the Chair's ruling and, after debate, the Senate sustained it by a vote of 25 to 22. Zemprelli's subsequent motion for reconsideration of the nomination was defeated. This quo warranto action ensued.

It is evident from the foregoing that the entire controversy before us turns on a single question of constitutional

---

1. Vincent J. Fumo, while elected senator, had not taken the oath of office nor assumed the duties thereof; R. Budd Dwyer had resigned his Senate seat to become Treasurer of the Commonwealth.

interpretation, namely the meaning of the phrase "a majority of the members elected to the Senate" in the context of Article IV, section 8. Before we may engage in such interpretation, however, we must first determine whether petitioners have standing to maintain this action. If we answer in the affirmative, we must then decide whether the dispute before this Court presents a "political question" not amenable to judicial review.

## I. Standing

█ Challenges to petitioner's standing to maintain the instant action, while not clearly articulated, have nonetheless been raised. Respondents allege that petitioners failed to plead the "special interest" required of private parties seeking to maintain a quo warranto action,[2] but in fact have an interest in the actions complained of no greater than that of the public at large.

We discussed this special interest requirement in *Stroup v. Kapleau*, 455 Pa. 171, 174, 313 A.2d 237, 238–239 (1973):

"An action in '[q]uo warranto can be instituted to determine the title to public office only by the Attorney General, the District Attorney *or a private individual who has a special interest* as distinguished from the interest of the public generally.' *Commonwealth ex rel. Specter v. Martin*, 426 Pa. 102, 108, 232 A.2d 729, 733 (1967) (emphasis added). In *Commonwealth ex rel. Schermer v. Franek*, 311 Pa. 341, 166 A. 878 (1933), this Court stated: 'To invoke the issuance of a writ of quo warranto the relator, therefore, must show in himself an interest in the controversy. . . . *He must possess some peculiar, personal interest* aside from his general interest as a member of the public.' *Id.*, 311 Pa. at 345, 166 A. at 879 (emphasis added). Article IV, section 8(a), of the Pennsylvania Constitution provides: 'The Governor shall appoint an Attorney General, a Superintendent of Public Instruction

---

**2.** While the separately labelled pleading of quo warranto has been effectively eliminated, *see* Pa.R.A.P. 1502, in favor of the "generic" petition for review, Pa.R.A.P. 1551 makes clear that the scope of review and substantive rights of the parties afforded by the previous action remain intact.

and such other officers as he shall be authorized to appoint. The appointment of the Attorney General, the Superintendent of Public Instruction and of such other officers as may be specified by law, *shall be subject to the consent of two-thirds of the members elected to the Senate.'* (Emphasis added.)

"Under the above constitutional provision, each member of the Senate has an individual right to confirm or reject certain gubernatorial appointments. Each Senator has an interest in such appointments aside from that Senator's interest as a member of the general public. We, therefore, conclude that the appellants in this case, all members of the Senate of the Commonwealth of Pennsylvania, had standing to commence this action in quo warranto."

Respondents argue that petitioners were afforded the opportunity to exercise their power as legislators by voting on the nomination, and, having voted, that their "special interest" ceased to exist. Where the voting process itself is not, as here, under attack, this argument might be persuasive. *See e. g., Metcalf v. National Petroleum Council,* 407 F.Supp. 257 (D.D.C.1976), *aff'd,* 553 F.2d 176 (D.C.Cir. 1977); *Wilt v. Beal,* 26 Pa.Cmwlth. 298, 363 A.2d 876 (1976); *cf. Public Citizen v. Sampson,* 379 F.Supp. 662 (D.D.C.1974), *aff'd,* 515 F.2d 1018 (D.C.Cir.1975). In *Stroup v. Kapleau, supra,* the appointments contested had been made without the advice and consent of the Senate. In the instant action, petitioners' argument that their advisory power and thus their effectiveness as legislators has been impaired appears to be grounded on the theory that their votes were in effect "diluted." [3] There exists at least a possibility that the

**3.** It is difficult to grasp the precise nature of this "dilution," of course, since each senator's vote carries proportionately *greater* weight under the Senate Rule when the Senate is composed of fewer than 50 members. However, the burden on the executive and on those Senators favoring confirmation *was* arguably lessened as a result of the definition of majority followed in the instant matter, which could be viewed as creating a corresponding increase in petitioners' burden, i. e., but for the Senate Rule, their negative votes would have been sufficient to defeat Respondent Daniels' confirmation.

Senate's interpretation of the constitutional majority requirement has resulted in some cognizable injury to petitioners in their legislative capacity.

Moreover, disposition of the substantive issue in the instant action will determine whether or not petitioners' effectiveness as legislators was in fact impaired. *See e. g., Kennedy v. Sampson*, 511 F.2d 430, 433 (D.C.Cir.1974). Under general standing requirements, petitioners have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962); *accord, Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961 (1968).

Respondents also challenge petitioners' standing by asserting that petitioners' interest is sheerly "political" rather than personal; that what is at stake here is not individual rights but political power.[4] In response to this assertion we need only reiterate our statement in *Stroup v. Kapleau, supra*, 455 Pa. at 175, 313, A.2d at 239, that "each member of the Senate has an individual right to confirm or reject certain gubernatorial appointments." Where it is alleged that such a right has been violated, we need not inquire into petitioners' motives for asserting it. *See e. g., Vitagraph Co. of America v. Swaab*, 248 Pa. 478, 493, 94 A. 126, 132 (1915); *Raughley v. West Jersey & S.R. Co.*, 202 Pa. 43, 47, 51 A. 597, 598 (1902).

Accordingly, we conclude that petitioners have alleged sufficient interest in the outcome of the instant action and have standing to bring it before this Court.

## II.  Political Question

We now proceed to respondents' contention that the issue raised by petitioners involves a non-justiciable political question. The political question doctrine is generally considered

4.  At the time of Respondent Daniels' confirmation, the Senate was composed of 25 Republicans and 23 Democrats.

to derive from the principle of separation of powers,[5] discussed most recently by this Court in *Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698 (1977):

> "A basic precept of our form of government is that the executive, the legislature and the judiciary are independent, co-equal branches of government. *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193 (1971) (plurality opinion); *Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474 (1969) (plurality opinion). The dividing lines among the three branches 'are sometimes indistinct and are probably incapable of any precise definition.' *Stander v. Kelley,* 433 Pa. at 421–22, 250 A.2d at 482 (plurality opinion). Under the principle of separation of the powers of government, however, no branch should exercise the functions exclusively committed to another branch. See *Wilson v. Philadelphia School District,* 328 Pa. 225, 195 A. 90 (1937); *Bailey v. Waters,* 308 Pa. 309, 162 A. 819 (1932). See generally *Stander v. Kelley,* supra; *Townships of Springdale & Wilkins v. Mowod,* 23 Pa.Cmwlth. 298, 352 A.2d 194 (1976), *rev'd on other grounds,* [474] Pa. [82], 376 A.2d 983 [1977]; *Jones v. Packel,* 20 Pa.Cmwlth. 606, 342 A.2d 434 (1975)."

*Id.,* 473 Pa. at 507–508, 375 A.2d at 705 (footnote omitted).

While the concept of standing focuses on the litigant and his relationship to the claim asserted, the political question doctrine is concerned instead with the claim itself. An excerpt from a recent attempt at synthesis of the case law in this rather elusive area of constitutional law may shed some light on the appropriateness of invoking the doctrine in the instant action:

> "[The political question doctrine] does not mark certain provisions of the Constitution as off-limits to judicial interpretation. But it does require federal courts to determine whether constitutional provisions which litigants would have judges enforce do in fact lend themselves to

5. This view is by no means universally held, however. *See e. g.,* Henkin, *Is There a "Political Question" Doctrine?,* 85 Yale L. J. 597 (1976); Scharpf, *Judicial Review and the Political Question: A Functional Analysis,* 75 Yale L. J. 517 (1966).

interpretation as guarantees of enforceable rights. To make such a determination, a court must first of all construe the relevant constitutional text, and seek to identify the purposes the particular provision serves within the constitutional scheme as a whole. At this state of the analysis, the court would find particularly relevant the fact that a constitutional provision by its terms grants authority to another branch of government; if the provision recognizes such authority, the court will have to consider the possibility of conflicting conclusions, and the actual necessity for parallel judicial and political remedies. But ultimately, the political question inquiry turns as much on the court's conception of judicial competence as on the constitutional text. Thus the political question doctrine, like other justiciability doctrines, at bottom reflects the mixture of constitutional interpretation and judicial discretion which is an inevitable by-product of the efforts of federal courts to define their own limitations."

L. Tribe, *American Constitutional Law* (1978) 79.

█ The decision as to whether a claim presents a non-justiciable political question is the responsibility of this Court as ultimate interpreter of the Constitution. *See Powell v. McCormack,* 395 U.S. 486, 519–521, 89 S.Ct. 1944, 1962–1964, 23 L.Ed.2d 491, 515–517 (1969); *Baker v. Carr, supra,* 369 U.S. at 211, 82 S.Ct. at 706, 7 L.Ed.2d at 682; *Sweeney v. Tucker, supra,* 473 Pa. at 510, 375 A.2d at 706. Although Professor Tribe's treatise provides a useful framework for judicial analysis, the definitive statement of the United States Supreme Court on the application of the political question doctrine, and the case on which respondents' challenge principally relies, is *Baker v. Carr, supra.* There the Court, having undertaken a survey of the entire line of political question cases, was able to isolate dominant features of claims which triggered political question treatment:

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a

function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Id.,* 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 685–686. The presence of any one of these elements will prompt a court to refrain from considering the claim asserted. The Court in *Baker* went on to add a cautionary note, however, that "[t]he cases ... show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." *Id.* at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686.

"Ordinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers. *See e. g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)." *Sweeney v. Tucker, supra,* 473 Pa. at 508, 375 A.2d at 705. Rather, it is the duty of the courts to invalidate legislative action repugnant to the constitution. *See e.g., Hertz Drivurself Stations v. Siggins,* 359 Pa. 25, 33, 58 A.2d 464, 469 (1948); *Commonwealth ex rel. Smith v. Clark,* 331 Pa. 405, 414, 200 A. 41, 46 (1938); *Respublica v. Duquet,* 2 Yeates 493 (1799).

■ In the instant action respondents argue that the very question at issue here, the proper meaning of "a majority of the members elected to the Senate," is a political question in that Senate Rule XXII, subparagraph 8, *supra,* defines the phrase, and since Article II, section 11 of the Pennsylvania

Constitution provides that "[e]ach House shall have power to determine the rules of its proceedings," the issue is "textually committed" to the Senate. Unquestionably the Senate has exclusive power over its internal affairs and proceedings. However, this power does not give the Senate the right to usurp the judiciary's function as ultimate interpreter of the Constitution under the guise of rulemaking, or for that matter, to make rules violative of the Constitution. *See, e. g., Opinion of the Justices,* 56 Del. 118, 190 A.2d 519 (Del.Sup.1963); 81A C.J.S. "States" § 52.

■ The definition of a constitutional majority, in addition, is not merely a procedural detail of concern only to the Senate, but rather represents, in the context of the separation of powers principle, a significant "check" upon the appointment power of the Executive whose dimensions must be prescribed by the Constitution itself, not by either the Legislature or the Executive. It is, therefore, not appropriate subject matter for legislative rulemaking.

Insofar as Senate Rule XXII–8 embodies the Senate's interpretation of Article IV, section 8(a) of the Constitution it must be accorded a certain amount of weight. *See, e. g., Commonwealth ex rel. Margiotti v. Lawrence,* 326 Pa. 526, 534, 193 A. 46, 49 (1937); *Montgomery v. Martin,* 294 Pa. 25, 39, 143 A. 505 (1928); *Maginnis v. Schlottman,* 271 Pa. 305, 308, 114 A. 782, 783 (1921). If it is at variance with the meaning and intent of the provisions it purports to construe, however, it is void. "When the Constitution clearly sets forth the manner in which something shall be done, that procedure must be followed to the exclusion of all others, including a procedure which the legislature may prefer; . . . ." *School Districts of Deer Lakes and Allegheny Valley v. Kane,* 463 Pa. 554, 564, 345 A.2d 658, 663 (1975); *see Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 117, 232 A.2d 729, 737 (1967); *Commonwealth ex rel. Smillie v. McElwee,* 327 Pa. 148, 158–159, 193 A. 628, 633 (1937). As stated above, it remains within the province of the courts to interpret the Constitution.

Since the issue here is the meaning of a constitutional provision and not the internal workings of the Senate, we need not address respondents' other contentions under the aegis of the political question doctrine.[6] It is clear from the foregoing that the subject matter of the instant action suffers from none of the constitutional infirmities enumerated in *Baker v. Carr, supra.* Accordingly, we conclude that petitioners' claim is justiciable and we shall proceed to consider its merits.

*III. "A Majority of the Members Elected to the Senate"*

■ This Court has announced clear guidelines to aid in the interpretation of constitutional provisions. In *Commonwealth ex rel. Paulinski v. Isaac,* 483 Pa. 467, 397 A.2d 760 (1979), we stated:

"Constitutional provisions are not to be read in a strained or technical manner. Rather, they must be given the ordinary, natural interpretation the ratifying voter would give them. *Commonwealth v. Harmon,* 469 Pa. 490, 366 A.2d 895 (1976); *Berardocco v. Colden,* 469 Pa. 452, 366 A.2d 574 (1976).

. . . .

"Where, as here, we must decide between two interpretations of a constitutional provision, we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter."

*Id.,* 483 Pa. at 475, 477, 397 A.2d at 765, 766. We believe the reading petitioners would impose upon Article IV, section 8(a) enjoys none of the characteristics of such an interpretation.

**6.** Respondents argue that the determination of the issue before us is also textually committed to the Senate by Article II, § 9, of the Constitution, which grants exclusive power to each House to judge the election and qualifications of its members. Additionally, respondents argue that deciding the issue raised in the instant action would involve the Court in undesirable partisan politics, in that our decision will effectively determine practical control of the Senate.

Petitioners contend that the phrase "a majority of the members elected to the Senate" means a majority computed on the basis of the total number of senators *elected* at a given time, whether or not such senators are, in the words of Senate Rule XXII–8, "living, sworn [or] seated." Hence, in the instant action, they would have us rule that Respondent Daniels was put into office by less than a constitutional majority, and should be ousted, because 50 senators were "elected," and her nomination received only 25 affirmative votes. Petitioners appear to be relying on the common or natural meaning of the word "elected" and the meaning of "member" as it is used elsewhere in the Constitution to arrive at this interpretation, disregarding the phrase as a whole and in the context of Article IV, section 8.

In our view, to compute a majority based on a number greater than the total voting group, even where, as here, the potential for ambiguity may exist, would be irrational. The purpose of Article IV, section 8(a) in requiring a majority of "members elected" would appear to be to ensure that the entire body of the Senate participates in the executive appointment confirmation process, rather than just a quorum. Thus, if in the instant situation the two persons not in office at the time of the vote on Respondent Daniels' nomination were instead merely absent, petitioners' method of computing a majority would have been correct. To include among the number of individuals charged with the responsibility of reviewing the qualifications of the Governor's nominees, senators-elect or former senators, neither entitled to vote in the Senate, would in no way enhance the ability of the Senate to advise and consent. What it would do, however, is cause Article IV, section 8(a) to require *greater than a majority vote* whenever there was a vacancy in the Senate.[7] This would place a proportionately greater burden on the executive branch when a vacancy or vacancies exist in the Senate, which could in turn encourage needless delay in filling appointive positions.

7. The duration of any such vacancy would be well over 60 days. *See* 25 Pa.C.S.A. § 2778 (Purdon 1981).

Additionally, under petitioners' interpretation, the number of "members elected" could be greater than the total number of senators provided for in the Constitution.[8]  For example, both defeated incumbents and the successful candidates who have not yet replaced them in office would be "members elected."  The same would presumably be true of senators who die or resign and those elected to fill their seats.  Both petitioners and respondents posit "doomsday" hypotheticals in which 25 of 50 senators are killed in a disaster.  While under respondents' interpretation of the phrase in question, a lesser number of senators could override the Governor's veto than were originally required to pass the vetoed bill, under the same circumstances, the Senate would be incapable of taking any action requiring the vote of a majority of all members if petitioners' interpretation of Article IV, § 8(a) were followed.  The latter consequence is by far the less desirable.

Petitioners' only support in Pennsylvania case law for their position appears to be the *Marshall Impeachment Case,* 363 Pa. 326, 69 A.2d 619 (1949), wherein petitioners find language of this Court they assert is controlling in the instant action.  In *Marshall,* President Judge Brown of the Philadelphia County Court of Common Pleas, on whose opinion we affirmed the trial court decision per curiam, stated:

> "Rule 4 of the Rules of Council, Manual of the City of Philadelphia for 1949, page 14, provides: 'A quorum shall consist of a *majority of the members elected to council.'* This number is twelve, and it governs even where variance exists in the Council membership of twenty-two.  It also constitutes a majority of such membership.  Therefore it seems that twelve councilmen must concur in finding the accused guilty . . . . "

**8.** Article II, § 16 provides in pertinent part: "The Commonwealth shall be divided into 50 senatorial ... districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable.  Each senatorial district shall elect one Senators, . . . . "

*Id.,* 363 Pa. at 345, 69 A.2d at 629. (emphasis added). We do not consider that decision relevant to the instant action. First, the language quoted was entirely unnecessary to the determination of the case, and, in fact, all 22 councilmen were seated at the time the opinion was written. Secondly, and most importantly, a Rule of Philadelphia City Council, not the Pennsylvania Constitution, is discussed. Finally, it is impossible to determine from the reported opinion whether this rule is being construed or whether, as is just as likely, the actual practice of the City Council is merely being described.

Petitioners find additional support in several decisions of the courts of other states, most notably, an advisory opinion of the Delaware Supreme Court, *Opinion of the Justices,* 251 A.2d 827 (Del.Sup.1969). There the court was asked to determine whether a constitutional provision stating that "a majority of *all the members* elected to each House shall constitute a quorum to do business" (emphasis added), meant the majority as prescribed by law, regardless of whether vacancies have occurred. *Id.* Answering in affirmative, the court used language which indicates that the Delaware Constitution has been interpreted along the lines urged upon us by petitioners. In light of the above discussion, however, we decline to follow such an interpretation.

Moreover, on the whole respondents' interpretation of the phrase "majority of the members elected" finds considerable support in the published decisions of American courts construing that phrase or portions thereof. *See e. g., State ex rel. Pickrell v. Myers,* 89 Ariz. 167, 359 P.2d 757 (1961); *State v. Penta,* 127 N.J.Super. 201, 316 A.2d 733 (1974); *Bailey v. Greer,* 63 Tenn.App. 13, 468 S.W.2d 327, 336 (1971); *Osburn v. Staley,* 5 W.Va. 85, 13 Am.Rep. 640 (1871); *State Bank of Drummond v. Nuesse,* 108 N.W.2d 283, 285, 13 Wis.2d 74 (1961). *But see Satterlee v. San Francisco,* 23 Cal. 315 (1863); *Smiley v. Commonwealth ex rel. Kerr,* 116 Va. 979, 83 S.E. 406 (1914).

We therefore adopt the interpretation of Article IV, section 8(a) placed upon it by the Senate in its Rule XXII–8,

and hold that "a majority of the members elected to the Senate" as employed in that subsection means "a majority of the members elected, living, sworn, and seated." Accordingly, the appointments of Respondent Daniels and of the other nominees confirmed by a vote of 25 senators are upheld as valid under the Constitution of the Commonwealth of Pennsylvania. The relief requested by petitioners is denied and their Petition for Review dismissed.