H. Craig Lewis, State Senator, Petitioner *v.* Governor Richard Thornburgh and Jay Waldman, Respondents.

Argued May 10, 1983, before President Judge CRUMLISH, JR. and Judges WILLIAMS, JR., CRAIG, MAC-PHAIL and DOYLE.

*Richard J. Welsh*, Legal Counsel, Minority Appropriations Committee, for petitioner.

*John P. Krill*, Deputy General Counsel, for respondents.

OPINION BY JUDGE CRAIG, June 24, 1983:

This case, in the nature of an equity proceeding addressed to our original jurisdiction, involves the efforts of petitioner Senator Lewis, Minority Chairman of the Appropriations Committee of the Senate of Pennsylvania, to obtain from the Governor of the Commonwealth certain personnel and fiscal information about all the lawyers on the public payroll or hired by the Executive Branch on public contract.

In *Lewis v. Thornburgh*, 68 Pa. Commonwealth Ct. 157, 448 A.2d 680 (1982) our court en banc ruled upon the respondents' preliminary objections. We sustained a preliminary objection based upon the absence of original jurisdiction in this court under the Right-To-Know Law, Act of June 21, 1957, P.L. 390, §§2, 4, *as amended*, 65 P.S. §§66.2, 66.4, but we overruled the preliminary objection demurring to the petitioner's reliance, in a second count, upon section 620 of the Administrative Code, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §240(a), which requires the Governor, on a monthly basis, to make expenditure data available to the Majority and Minority Chairmen of the Appropriations Committees of the Senate and the House of Representatives. The Governor must pro-

vide data relating to personnel positions and expenditures, in the aggregate and by category, "either in finished reports or on computer tapes," as those chairmen shall request. Subsection (a) concludes with the provision most directly involved here:

> In addition to the above specified budgetary data, the Governor shall make available any other budgetary data as may be requested from time to time by the Majority and Minority Chairmen of the Appropriations Committees of the Senate and House of Representatives.

We also considered the Governor's contention that the issue under the Administrative Code provision presented a non-judicial political controversy. For reasons discussed below in connection with respondents' exceptions to conclusions of law, we rejected that contention, with Judge MacPhail of our court dissenting on that point alone and concurring otherwise.

After considering the preliminary objections, this court responded to the Senator's subsequent motion for summary judgment by proceeding under Pa. R.C.P. 1035(c) to make an order specifying the facts that appeared without substantial controversy and then, following pre-trial procedure, to hold a hearing which completed the record.

The facts, as ably presented by counsel for both sides — by stipulations and exhibits and through the testimony of skilled state recordkeeping personnel — were clear and not substantially controverted on the record.

The chancellor made findings of fact and conclusions of law, discussed in connection with the exceptions below, and issued a decree nisi requiring that the requested information be provided in accordance with the Administrative Code.

The respondents' exceptions, thereafter filed, have been briefed and argued to the court en banc. Our disposition of them follows.

## EXCEPTIONS TO FINDINGS OF FACT

Initially, no exceptions are taken to findings 1 and 2 as follows:

1. The petitioner is Senator H. Craig Lewis, Minority Chairman of the Appropriations Committee of the Senate of Pennsylvania, and the respondents are the Governor of the Commonwealth, Dick Thornburgh, and his General Counsel Jay Waldman.

2. By letter of August 14, 1981, the Senator requested from all cabinet secretaries of the Commonwealth, as to persons employed as legal counsel, the eight items of information first listed above, which listing is incorporated into this finding by reference.

Finding No. 3 is:

3. By letter of August 19, 1981, the Senator asked all executive agencies, authorities and boards for information concerning employed legal counsel and bond or outside counsel retained upon contract, respectively seeking as to legal counsel the five items of information noted secondly above and, as to bond or outside counsel, the four items of information listed above at the same point, both of which listings are incorporated into this finding by reference.

Respondents' exceptions 1 and 5 object only to the use of the word "all" in referring to the number of agencies to which the Senator directed information requests. We sustain this exception to the extent of deleting the word "all" and substituting "fifteen major" so that the reference is to "fifteen major" executive agencies, authorities and boards.

The fourth finding reads as follows:

4. As contained in exhibits authenticated by mutual stipulation and received in evidence, the chronology of the correspondence thereafter is as follows:

August 21, 1981 The Executive Deputy General Counsel requested of cabinet members and executive agency heads "that no information be released to Senator Lewis until the General Counsel has returned and has had an opportunity to review the request."

August 26, 1981 The Senator submitted the request to the Governor, protesting the memorandum of the Executive Deputy General Counsel.

September 3, 1981 The Senator wrote again to cabinet members and executive agency heads, renewing the request notwithstanding the memorandum from the Executive Deputy General Counsel.

September 10, 1981 The Governor did not reply to the Senator's August 26th letter to him, but the Executive Deputy General Counsel wrote to the Senator that the "raw data" is available in the State Library, for "research" by the Senator's own staff.

September 16, 1981 The Senator's Executive Assistant responded to the Executive Deputy General Counsel, stating that the Senator's staff had attempted to obtain the information at the State Library and had been unable to obtain information which was complete and current.

January 8, 1982 The Senator wrote to the Governor, renewing the requests for information.

January 20, 1982 The Governor did not reply, but his General Counsel replied that the information had not been refused, but that it would

take time. The General Counsel offered to provide only information concerning attorneys in the Office of General Counsel, referring the Senator to the inspection of records in the Office of Budget and Administration as to attorneys in the executive agencies.

January 26, 1982 The Senator replied to the General Counsel, stating that the request also involved the executive departments and outside counsel and thus was beyond the information offered.

January 21, 1982 The General Counsel replied to the Senator that "for legal and policy reasons," the transmission of certain data may not be appropriate, but suggesting discussion and delay of the proceedings in this court.

August 9, 1982 The Senator wrote to the General Counsel, following this court's decision on preliminary objections, renewing the request.

August 17, 1982 The Senator wrote to the Governor renewing the request.

August 25, 1982 The Governor did not reply, but the General Counsel replied, stating that data could be inspected and that granting the request would moot the case in this court.

October 4, 1982 Senator Edward P. Zemprelli of the Senate of Pennsylvania wrote to State Treasurer R. Budd Dwyer requesting information on current contracts with private law firms or private lawyers.

October 19, 1982 The State Treasurer submitted information on lawyers or law firms hired, the agency, the nature of the work, and the total value and period of the contract, from the information files of the Treasury Department.

October 25, 1982 Senator Eugene F. Scanlon wrote to the State Treasurer, noting that the listing furnished October 19 did not contain a certain contract of June 29, 1982 between the Department of General Services and Bruce W. Kauffman, Esquire.

October 29, 1982 The State Treasurer replied to Senator Scanlon stating that the Treasurer's contract information bureau had not received the contract in question, but that it had been received by the Bureau of Audits and Administration on October 26, 1982

Although no exception is taken to the item dated August 21, 1981 as stated above, respondents' exception No. 2 contends that the chancellor, in discussion, should not have characterized the memorandum of the General Counsel's office as "directing" cabinet members and executive agency heads not to supply the information. Although the letter from the Executive Deputy General Counsel did state, as found in Finding No. 4, "I am requesting that no information be released....", it is wholly unrealistic to contend that such a request from the office of the Governor's General Counsel does not have the effect of a directive to the Governor's appointees, and the exception is overruled on that ground as well as upon the basis of the correct statement in Finding No. 4.

Finding No. 5 read as follows:

5. The Senator submitted his requests to the Governor individually and personally, as well as to certain of the Governor's subordinates, as noted in Finding No. 4 above.

Exceptions 3, 6, 7, 8, 9 and 10 all object to the statements, in Findings Nos. 4 and 5, to the effect that the Senator submitted his request to the Governor, under dates of August 26, 1981, January 8, 1982 and August 17, 1982. Respondents contend that, in letters

bearing those dates, the Senator was only asking the Governor to lift the so-called "gag order" of the General Counsel's office, rather than requesting the information. Of course, a request to remove a barrier to the provision of information is quite equivalent to a request that the information be made available. Indeed, in petitioner's Exhibit J, the Senator's letter of January 8, 1982, there was a clear request that the Governor "authorize the Cabinet and agency heads to respond" with the information. Then, in petitioner's Exhibit O, the Senator's letter of August 17, 1982, there is the paragraph:

> Therefore, I am asking you, as the chief executive officer of this state, to advise members of the Cabinet and the heads of the executive agencies that they are now free to provide us with the information we requested over a year ago.

Exception 3 and exceptions 6-10 inclusive are therefore overruled.

No exception has been taken to Finding No. 6, which states:

> 6. The Senator's request for information to the Governor was made only by him as Minority Chairman of the Appropriations Committee of the Senate. The Majority Chairman of that committee and the Majority and Minority Chairmen of the Appropriations Committee of the House of Representatives did not participate in making the request.

Finding No. 7 reads as follows:

> 7. To date, the Governor has not supplied the information requested by the Senator, nor has it been supplied by the executive agencies, authorities and boards.

Exceptions 4 and 11 are taken to this finding, on the basis of the contention that various generalized reports

and information presently available to the Senator do contain all of the information requested, if the Senator would only, with the assistance of computer retrieval and reprogramming of computers, search through a number of reports and winnow out the information. Exceptions 4 and 11 are overruled on the basis of the facts provided in the testimony by the recordkeeping and data processing experts, contained in Finding No. 8 which reads:

8. The reports and information presently being supplied by the Governor to the Senate as an ongoing practice, and available to the Senator, do not supply all of the information requested, either as individual reports or taken in the aggregate. Some of the reports contain individualized information, such as names and hiring dates, but they list all state employees en masse, without grouping legal positions separately. None of the reports provide individual information concerning contracts under which outside private lawyers are hired; they present only generalized dollar expenditure information. Findings as to the specific reports are as follows:

(a) The monthly complement report (PMS-25037) lists all positions under the governor's jurisdiction, without sorting out legal positions separately, to show name, department, pay range and salary. Because this report consists of thousands of pages, it would be very difficult to cull out attorney positions separately.

(b) Annual personnel reports (PMS-40B, PMS-041) are yearly reports of all state personnel issued in January and July, respectively, and not updated on any basis more current. Attorney positions are not selected out separately,

and, because this is an employee listing, contractual relationships with private outside attorneys are not included. The information requested by the Senator could not be obtained, either completely or on an up-to-date basis, from these reports, according to the data-processing executives.

(c) Monthly allotments report (BFM No. 12) is a list of allotment ("budget") categories of all kinds. One of the categories is No. 312, for legal fees, but this report lists only total dollar amounts of expenditures and available balances, without any identification of specific legal contracts.

(d) There is a report listing filled and vacant positions (PMS-937) as to attorneys, but it contains no names or information as to full or part-time status, or dates when positions have been filled or terminated, as requested.

(e) Information as to contracts with private attorneys is not routinely supplied by the Governor to the Senate in any of the above reports or otherwise. The Bureau of Contracts Information of the State Treasury Department, pursuant to statute, does maintain for public inspection a file of all contracts, including contracts with outside legal counsel. However, the completeness and accuracy of this file with respect to such contracts made by the Executive Branch is dependent on the contract being supplied by the Executive Branch. According to the director of that bureau, the files were incomplete as to the "Kaufmann contract" until, at the request of the State Treasurer, the Executive Branch remedied the omission.

Exceptions 12 and 13, taken to the foregoing, are overruled; the findings are based upon the testimony of

data processing experts from both the executive branch and the legislative branch, none of whom contradicted or controverted each other.

Exception 14, relating to subparagraph (e) of Finding No. 8, acknowledges the omission therein noted, but nevertheless argues with the finding without indicating any contrary evidence. It must be overruled.

Finding No. 9 reads as follows:

> 9. Supplying the information requested would not be unduly burdensome upon the Executive Branch or the Governor's Central Management Information Center. According to data-processing experts, computerized files can be reprogrammed to select the information requested. However, for the Legislative Data Processing Center (LDPC) to extract the requested information from computer tapes supplied to it by the Executive Branch would be less feasible because the LDPC is dependent upon the data content, and the format in which it is supplied, by the Executive Branch.

Exception 15, directed to Finding No. 9, also contends merely that the Legislative Data Processing Center does have "search capability." The record supports the key point that the legislative branch is dependent upon both content and format as supplied by the executive branch.

### EXCEPTIONS TO CONCLUSIONS OF LAW

*General Counsel as Party Respondent, in Addition to the Governor*

Exception 16 is directed to Conclusion of Law No. 1, holding that the General Counsel is a proper party respondent, as well as the Governor.

Respondents' contention that the Governor should not be a party, on the ground that no request was

made to the Governor, is rejected by reason of the facts set forth in the findings above.

The General Counsel also is properly a respondent, as one against whom relief must be sought, because initially the Office of the General Counsel, and then the General Counsel himself, was interposed between the Senator and his request to the cabinet and then to the Governor. The content of the correspondence from the General Counsel's office (Finding No. 4) is plainly administrative in nature, not merely the words of legal counsel speaking on behalf of a client. Although the Administrative Code section names the Governor, and not the General Counsel, as the one who "shall" supply information, the General Counsel cannot undertake the function of barring the transmission of information and then claim non-involvement.

Exception 16 is therefore overruled.

### Budgetary Data

Conclusion of Law No. 2, holding that the information requested by petitioner is budgetary data as specified in Administrative Code §620(a), is attacked by exception 17, 28 and 29.

Of course, personnel expenditures and contractual commitments are budgtary data; section 620(a) starts out by listing matters such as filled and vacant personnel positions and their costs, and then refers to that listing as "the above specified budgetary data," thus confirming that the Senator's request for information about personnel positions, and their costs, was obviously directed to a subset of budgetary data.

Exceptions 17, 28 and 29 are therefore overruled.

### Request by One Chairman

Exception 18 is directed to Conclusion of Law No. 3 which reads:

3. The duty to supply information under the Administrative Code is mandatory whether

the request is made by one or more of the legislative chairmen listed in the section.

Because Administrative Code Section 620(a) refers to budget data requested "by the Majority and Minority Chairmen of the Appropriations Committees of the Senate and the House of Representatives," the respondents argue that the Governor is not required to respond to any request unless it is made jointly and simultaneously by all four of those legislative officials.

Although our decision on preliminary objections has heretofore rejected this proposition, it can here be re-examined more specifically.

To say that the legislature intended to provide that budgetary data could be obtained on a specific basis from the Governor only when committee chairmen from both sides of the aisle in both houses of the legislature have made the request in a joint chorus is inherently implausible, particularly because the two houses of the legislature are not likely to need or want the same information simultaneously. Moreover, to require such a joint request would be to give each house, and each party group, an effective veto over any request by the other for information concerning how the tax money is being spent.

The presence of the word "and" between the references to the chairman and the references to the legislative houses does not, as a matter of law, mandate any such implausible interpretation.

As the Pennsylvania Supreme Court has stated in *Petrash Guardianship*, 425 Pa. 433, 437, 229 A.2d 878, 879-80 (1967), quoting *United States v. Fisk*, 70 U.S. 445, 447 (1866):

"In the construction of statutes, it is the duty of the Court to ascertain the clear intention of the legislature. In order to do this, courts are often compelled to construe 'or' as meaning 'and' and again 'and' as meaning 'or.' "

*Petrash* involved a statute which provided for the appointment of a "guardian of the person and estate." The Supreme Court held that the phrase could be read in the disjunctive, despite the word "and" as connective, thus permitting the appointment of a guardian of the estate alone.

In *Philadelphia National Bank v. Buchman*, 314 Pa. 343, 349, 171 A. 589, 591 (1934), the Supreme Court stated:

> In this State when construing the intention of the legislature[,] we have often been obligated to construe the conjunctions "or" and "and" interchangeably.

*See also Pennsylvania Labor Relations Board v. Martha Company*, 359 Pa. 347, 352, 59 A.2d 166, 168-69 (1948).

The point is by no means new. In *Rolland v. Commonwealth*, 82 Pa. 306 (1876), the Supreme Court stated that

> [the word] "and" is not always to be taken conjunctively. It is sometimes, in the fair and rational construction of the statute, to be read as if it were "or" and taken disjunctively and distributively.

82 Pa. at 326.

This court, in *Appeal of Martin*, 33 Pa. Commonwealth Ct. 303, 306, 381 A.2d 1321, 1322 (1978), held that a reference to a transcript of testimony being "in existence and available" had to be read as referring to the transcript being in existence "or" being made available (by the transcribing of stenographer notes), relying upon the interpretation ruling in *Petrash*.

Hence, as when we overruled the demurrers, our conclusion is that a request by any of the appropriations committee chairmen, majority or minority, is sufficient to require the submission of the budgetary data. Such an interpretation is thoroughly in accordance

with the strong policy evident throughout our statutes and judicial decisions in many respects, that openness of information in government is to be encouraged, emphasized, and, if necessary, required.

*Potential Availability of Requested Information*

Exception 19 is directed to Conclusion of Law No. 4 which reads:

> 4. The potential availability of the requested information by way of research into a variety of sources, whether the degree of difficulty of such research be extensive or impossible, does not relieve the Governor of the duty to supply information under the section.

Exception 19 is overruled.

Respondents devoted their presentation of evidence almost entirely to an attempt to establish the proposition that the information requested by the Senator is presently available, either by culling it from a mass of printouts or computer tape reports now submitted to the Legislature by the Executive Branch, or by researching it in the State Library or the State Treasury Department.

First, it must be noted, respondents supplied no legal authority for the proposition upon which they thereby implicitly rely — the seeming claim that the Governor has no obligation to supply information if it is otherwise available. No such exception or exemption is stated or implied in the Administrative Code provision.

Moreover, firsthand examination of the many exhibits which illustrate the various reports, along with the testimony, establishes that even extensive research, including computer reprogramming, would not permit a requesting senator, even with the assistance of the Legislative Data Processing Center, to unearth the items requested in any feasible manner. Clearly, the

problem is that the requested information obviously originates from the Governor and the Executive Branch, which has the basic control over its format and oganization when originated. Therefore, the legislative members and their data-processing facilities are necessarily, as recipients, in a dependent position.

Mr. Campbell of the Legislative Data Processing Center testified that his center could not provide the information in a complete form or manner with regard to all departments, boards or commissions, even from the annual personnel report (PMS-041) which lists all employed personnel positions. Nor, according to that witness, could the requested information be obtained by using a combination of that report and the filled and vacant position report (PMS-937), because the two reports cannot be correlated with each other.

Mr. Nousianen, project manager of the Personnel Management System in the Executive Branch, testified that the monthly report of all state positions (PMS-25037), containing thousands of pages, would present a very difficult challenge in order to select out attorney and legal counsel positions.

With respect to contracts with outside legal counsel, respondents presented no evidence that any such information is now being supplied by the Executive Branch to the Senator or to the legislature in general. Respondents have no basis in law or fact on which to claim that information has been supplied by the Senator by virtue of the fact that it is supplied to the State Library or to the State Treasury, particularly when the bureau director in the latter department confirmed on the witness stand that the body of contract information can be incomplete.

### Justiciability

Exceptions 22-27, inclusive, appear to question our conclusion, made in *Lewis v. Thornburgh*, 68 Pa.

Commonwealth Ct. 157, 453 A.2d 388 (1982), and followed by the chancellor, that this case presents a justiciable issue.

In considering the claim that the case presents a nonjusticiable political controversy, we reviewed the criteria from *Baker v. Carr*, 369 U.S. 186, 217 (1962), as quoted by the Pennsylvania Supreme Court in *Zemprelli v. Daniels*, 496 Pa. 247, 256, 436 A.2d 1165, 1169 (1981).

Only the first two of the nonjusticiability criteria which we listed in *Zemprelli v. Thornburgh*, 47 Pa. Commonwealth Ct. 43, 50-51, 407 A.2d 102, 106 (1979) were raised, and the first — a textually demonstrable constitutional commitment of the issue to one branch for "self monitoring," *Sweeney v. Tucker*, 473 Pa. 493, 510, 375 A.2d 698, 706 (1977) — is plainly not present because the matter involves only the transmission of information, not the exercise of any executive or legislative power.

Although the Pennsylvania Constitution commits the budget preparation function to the executive by Pa. Const. art. 8, section 12, we concluded that having the executive reveal how tax money is being spent would not constitute either a legislative or judicial intrusion into the executive's role in the budgeting process, which is constitutionally shared between the executive and the legislature. Nor is there here any attempt to authorize one branch to perform any "functions belonging to the other nor exercise such influence over the persons conducting the affairs of other departments as to control their actions." *Bailey v. Waters*, 308 Pa. 309, 313, 162 A. 819, 821 (1932).

The second justiciability criterion, whether or not there are judicially discoverable and manageable standards for resolving the question here, was also raised by respondents.

Although the Administrative Code section in this case merely requires the Governor to supply such budgetary data as may be requested, and the items listed in the request are quite explicit and unambiguous, respondents argue as if we were required to interpret and apply the provision of Pa. Const. art. 8, section 12, which requires the Governor annually to submit to the legislature projected operating expenditures "in reasonable detail." Although Administrative Code section 620(a) undoubtedly serves to implement the constitutional section in part, nothing in this case requires this court to resolve any degree of detail. The requests here quite specifically seek names, dates, places and dollar amounts of salaries or fees; there is nothing to interpret.

Nor can this court be excluded from considering the disclosure of information about the expenditure of public monies on the basis that, the parties being on opposite sides of party fences, this is a "political" question. Judicial consideration as to the transmission of information, as an ingredient for the making of governmental policy, in no way involves this court in the political process of policy formulation. The fact that the General Counsel and his subordinate and an assistant of the Senator each included some partisan contentions in the correspondence does not make the real issue in this case a political one.

EXCEPTIONS TO DECISION, DECREE AND RELIEF

The remaining exceptions, 20, 21, 30, 31 and 32, all relate to the refusal of nonsuit, the decree, and the relief.

In view of the findings and legal conclusions above, they are overruled. We append a final decree in accordance.

## Final Decree

Now, June 24, 1983, respondents' Exceptions 1 and 5 are sustained to the extent stated in the foregoing opinion, all other exceptions are overruled, and respondents, within thirty (30) days, shall provide to petitioner the requested information as follows:

(1) with respect to all persons employed by the executive branch as legal counsel, information as to —

    (a)  name,

    (b)  residence,

    (c)  date employed,

    (d)  full or part-time status,

    (e)  salary range,

    (f)  current salary,

    (g)  salary when appointed;

(2) with respect to all persons employed as legal counsel by state executive agencies, authorities and boards, information as to —

    (a)  name,

    (b)  residence,

    (c)  date employed,

    (d)  salary when appointed,

    (e)  salary range; and

(3) with respect to all persons retained or hired on contract as bond counsel or outside legal counsel, information as to —

    (a)  name,

    (b)  date retained or hired,

    (c)  retainer fee, if any, and

    (d)  fees paid to date.

Exceptions Noted and Bill Sealed.

CONCURRING OPINION BY JUDGE MACPHAIL:

In *Lewis v. Thornburgh*, 68 Pa. Commonwealth Ct. 157, 453 A.2d 388 (1982), I dissented to that part of the majority opinion which held the issue before the Court to be justiciable. Nothing that has happened in this case since it first came before us has changed my mind in this regard. If anything, what appears in the majority opinion today reenforces what I wrote a year ago. The information the Petitioner seeks *is* available.[1] I remain unconvinced that the Petitioner seeks the information solely for budgetary purposes.[2] By the same token, had the executive branch immediately supplied the information requested since it is a matter of public information, this Court would have been spared valuable judicial time[3] in resolving the issue. As I said before, my concern is not so much with the resolution of this case as it is with the precedent that it sets for the future.

Since, however, the law of the case is contrary to my view, and the majority opinion has correctly treated the exceptions to the learned Chancellor's findings and conclusions, I am compelled to concur in the result.

---

[1] See Findings of Fact 8(a), slip opinion page 10 and 8(c) slip opinion page 11. The fact that it would present a "very difficult challenge" to select out attorney and legal counsel positions does not impress me. What is clear is that the information *is* available without resort to legal remedies.

[2] Much was made at oral argument of the omission of the so-called Kauffman contract. One wonders how the Petitioner came upon *this* information if it is so difficult for him to obtain it except by means of this law suit.

[3] Three extensive opinions have been written by this Court on this matter.