# [J-43-2023]
## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

## TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.

| | | |
|---|---|---|
| PENNSYLVANIA STATE EDUCATION ASSOCIATION, | : | No. 90 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court at No. 199 |
| | : | MD 2021 dated July 21, 2022. |
| | : | |
| v. | : | ARGUED:  September 12, 2023 |
| | : | |
| | : | |
| PUBLIC SCHOOL EMPLOYEES' | : | |
| RETIREMENT BOARD, | : | |
| | : | |
| Appellee | : | |

## OPINION

**JUSTICE WECHT**                                    **DECIDED:  March 21, 2024**

This appeal concerns the requirements for establishing standing to pursue an action for a declaratory judgment.[1]  The Pennsylvania State Education Association ("PSEA") brought such an action against the Public School Employees' Retirement Board ("PSERB" or the "Board"), challenging a Resolution in which PSERB addressed the manner in which it intended to apply a statute, and which states an approach that PSEA believes to be impermissible.  The Commonwealth Court dismissed PSEA's action for lack of standing.  We conclude that PSEA's averments established standing.  We thus reverse the Commonwealth Court's order and remand the matter in order to allow PSEA's action to proceed.

---

[1]     *See* Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-41.

## I. Background

The underlying dispute concerns a recently enacted provision of the Public School Employees' Retirement Code,[2] which was meant to remedy a problem that occurred when an employer withdrew employees from the Public School Employees' Retirement System ("PSERS" or the "System"), the multi-employer pension plan for employees of public schools. Previously, when an employer withdrew employees from that plan, it would leave behind unfunded liability for the vested but unpaid benefits that PSERS owed the former employees—a financial burden that would be shouldered by the other employers who remained in the System. In 2019, the General Assembly added Section 8327.1 to the Code, which provides, in relevant part:

> **(a) General rule.**--A nonparticipating employer is liable to the system for withdrawal liability in the amount determined under subsection (c). A nonparticipating employer is an employer that is determined by the board to have ceased:
>
> > (1) covered operations under the system; or
> >
> > (2) to have an obligation to contribute under the system for all or any of the employer's school employees but continues covered operations.
>
> **(b) Determination.**--An employer shall, within the time prescribed by the board in a written request, furnish such information as the board deems necessary to administer this section and to determine whether an employer is a nonparticipating employer. If the board determines that an employer is a nonparticipating employer, the board shall:
>
> > (1) determine the nonparticipation date;
> >
> > (2) determine the amount of the employer's withdrawal liability;
> >
> > (3) notify the employer of the amount of the withdrawal liability; and
> >
> > (4) collect the amount of the withdrawal liability.[3]

---

[2]    24 Pa.C.S. §§ 8101-8547 (hereinafter, the "Code").

[3]    24 Pa.C.S. § 8327.1(a)-(b).

Section 8327.1 imposes "withdrawal liability" upon school district employers that PSERB determines to be "nonparticipating," which include both those that cease "covered operations" under PSERS and those that withdraw some but not all of their employees from the System.[4] Withdrawal liability is an added cost to a school district employer when it makes certain employment decisions that affect the funding of the System, shifting the pension costs onto the employer that makes the decision rather than the employers that remain in the System. Because withdrawal liability affects the bottom-line cost to the employer of withdrawing employees, however, it may affect the employer's decision as to whether a contemplated employment decision is financially worthwhile in the first place.

Section 8327.1 relies upon PSERB for its implementation. Specifically, and most importantly for our purposes, it is PSERB's duty under Section 8327.1 to make the determination as to whether and when an employer becomes a "nonparticipating employer" that incurs withdrawal liability. On December 11, 2020, PSERB posted guidance on its website regarding Section 8327.1, which explained the reason for the enactment and gave some indication as to how PSERB interpreted its obligations thereunder.[5] Then, on March 5, 2021, PSERB adopted Resolution 2021-08, which provided as follows:

---

[4] Section 8327.1 further provides the formula for calculating a nonparticipating employer's "withdrawal liability" in subsection (c), specifies the method for valuing benefits in subsection (d), states how the calculation must treat interest rates in subsection (e), and directs the manner in which a nonparticipating employer must pay its withdrawal liability in subsection (f). None of these provisions are pertinent here.

[5] This posting provided:

Effective September of 2019, Act 72 of 2019 requires PSERS to calculate and collect a withdrawing employer's unfunded retirement benefit liabilities, *i.e.*, the employer's "withdrawal liability." Prior to September 2019, when an employer terminated its participation in PSERS, for all or some of its employees, that employer's share of the system's unfunded retirement benefit liability was re-allocated to the remaining employers. Such

(continued…)

RESOLVED that [PSERB] directs [PSERS] staff to perform an outreach to relevant organizations to elicit input and feedback and to research and prepare a report for the Board assessing the applicability of Section 8327.1 of the [Code] to outsourcing scenarios prior to applying the provision of Section 8327.1 to such scenarios.

*In the interim, no action will be taken by PSERS regarding withdrawal liability as it pertains to outsourcing until further policy is approved by the PSERS Board and by legislation.*[6]

Thus, through the Resolution, PSERB stated its intent not to apply Section 8327.1 to "outsourcing" scenarios, *i.e.*, subcontracting, until further notice.

---

withdrawals, under a cost-sharing multiple employer plan like PSERS, resulted in an increased funding obligation for the remaining employers. The withdrawal liability is designed to relieve the additional funding burden on the remaining employers.

Under the Public School Employees' Retirement Code, an employer is deemed to withdraw from PSERS when it ceases covered operations under the system or ceases to have an obligation to contribute under the system for all or any of its employees but continues covered operations. Thus, an employer will be responsible for paying a withdrawal liability when, for example, it permanently closes all operations or creates an alternate retirement plan to cover some or all new employees. The calculation and payment of the withdrawal liability differs based on whether the employer is ceasing operations entirely or continuing participation in PSERS for some employees, but not all. For a complete withdrawal, a lump sum amount is due PSERS. For a partial withdrawal, the amount owed may be paid over time.

\* \* \*

If you are considering closing a school, creating an alternate retirement plan, or in any other way limiting PSERS membership for employees, you should contact the PSERS Employer Service Center for more information.

*PSEA v. PSERB*, 199 M.D. 2021, 2022 WL 2840514 (Pa. Cmwlth. July 21, 2022) (unreported) ("*PSEA*"), slip op. at 3 n.2 (quoting Amended Petition for Review ¶ 12) (cleaned up); *see* Employer News Archive, December 11, 2020, *available at* https://www.psers.pa.gov/Employers/pages/EmployerNewsArchive.aspx (last visited December 4, 2023).

[6]     PSERB Resolution 2021-08 (the "Resolution") (emphasis added); *see* Amended Petition for Review ¶ 13 & Exhibit A; *PSEA*, slip op. at 4.

PSEA,[7] on behalf of itself, its members, and its local union affiliates, brought an action against PSERB in the Commonwealth Court's original jurisdiction, seeking a declaratory judgment that PSERB's Resolution was unlawful, and that Section 8327.1 does, in fact, apply to situations in which the work of school employees is subcontracted to private entities, where such subcontracting results in the removal of employees from the System.[8] On PSEA's reading of Section 8327.1, a public school employer's decision to subcontract the work of union-member employees can render the employer "nonparticipating" under Section 8327.1(a)(2), triggering an assessment of the employer's withdrawal liability. This additional cost, in turn, would affect the employer's determination of whether subcontracting would provide a cost-savings sufficient to justify the decision.

PSEA averred that, under Pennsylvania law, subcontracting the work of union members is a mandatory subject of collective bargaining, and that, under the Public Employe Relations Act,[9] an employer considering subcontracting for economic reasons commits an unfair labor practice if it fails to advise the union of the projected savings and

---

[7] PSEA is "a nonprofit corporation and labor organization representing over 178,000 members, most of whom are employees of public-school districts of the Commonwealth and members of the System. PSEA has over 1,000 affiliated local associations, most of which are certified as exclusive-bargaining representatives of employees of public-school districts of the Commonwealth." Amended Petition for Review ¶ 1.

[8] *See id.* at ¶¶ 64 (requesting declaration that the Resolution "was entered *ultra vires* and is a legal nullity"), 73 (requesting declaration that "Section 8327.1 of the Code applies when participating school employers subcontracts/outsources [*sic*] work to private actors, resulting in removal of public-school employees from the System").

PSEA initially sought a declaration that Section 8327.1 applies to the conversion of a public school into a charter school, as well, but it has since abandoned that aspect of its action because the proposed charter school conversion that it cited is no longer under consideration. *See* PSEA's Br. at 3 n.1 (noting that PSEA "is no longer seeking relief related to charter schools"). Accordingly, our discussion here is limited to the issue of subcontracting the work of union members.

[9] Act of July 23, 1970, P.L. 563, 43 P.S. §§ 1101.101 – 1101.2301 (the "PERA").

to give the union an opportunity to match those savings.[10] Because withdrawal liability affects the bottom-line cost to the employer, PSEA averred, "[u]nless school districts and unions representing public-school employees know that withdrawal liability will be imposed when school districts remove members from the System due to subcontracting bargaining unit work, school districts and unions will not be able to fulfill their obligations under PERA."[11]

According to PSEA, PSERB's Resolution already has presented difficulties in negotiations over subcontracting decisions at the Pocono Mountain, Shikellamy, and Port Allegany School Districts. In each of those school districts, PSEA averred, work performed by PSEA's members was outsourced (or proposed to be outsourced) to private entities, and PSEA's local union affiliates were unable to bargain effectively because the school districts, relying upon the Resolution, believed that Section 8327.1 did not apply under the circumstances.[12] In PSEA's view, the school districts based their decisions upon an inaccurate assessment of the projected cost-savings because they failed to take into account the amount of withdrawal liability that the subcontracting decision should trigger under Section 8327.1. Due to the Resolution, the school districts and the unions were not basing their calculations upon the same numbers, and the unions were thus unable to determine whether they could match the amount that the school districts could expect to save through subcontracting.

---

[10]     Amended Petition for Review ¶¶ 16-17 (citing, *inter alia*, 43 P.S. § 1101.1201(a); *PLRB v. Mars Area Sch. Dist.*, 389 A.2d 1073, 1075 (Pa. 1978); *Morrisville Sch. Dist. v. PLRB*, 687 A.2d 5, 8 (Pa. Cmwlth. 1996)).

[11]     *Id.* ¶ 18.

[12]     *Id.* ¶¶ 19-46. PSEA averred that the subcontracting decisions already had occurred in the Pocono Mountain and Shikellamy School Districts when it commenced its action. The subcontracting decision at issue in the Port Allegany School District was under consideration at the time.

PSEA asserted that it had associational standing to challenge the Resolution because at least one of its members had suffered injury attributable to it.[13] As relief, PSEA sought a declaration that PSERB acted *ultra vires* in adopting the Resolution, because Section 8327.1 imposes a mandatory duty upon PSERB, which "has no authority to suspend the implementation of an existing statutory mandate until some indefinite time in the future when it may approve policy" relating to its application of the statute.[14] Additionally, PSEA sought a declaration that Section 8327.1 applies to outsourcing decisions, because a school district that subcontracts work formerly performed by employees in the System puts it "squarely within the definition of a 'nonparticipating employer' as set forth in Section 8327.1(a)(2): it has ceased to have an obligation to contribute under the System for all or any of its employees but continues covered operations."[15]

PSERB filed preliminary objections that, in relevant part, challenged PSEA's standing to bring its action. The Pennsylvania School Boards Association, Inc. ("PSBA"), was granted intervention, and it also filed preliminary objections challenging PSEA's standing. The Commonwealth Court sustained these preliminary objections and dismissed PSEA's action.[16]

---

[13] *Id.* ¶ 14 ("PSEA has standing to bring this action because 'at least one of its members is suffering an immediate or threatened injury as a result of the challenged action.'") (quoting *Americans for Fair Treatment, Inc. v. Philadelphia Fed'n of Tchrs.*, 150 A.3d 528, 533 (Pa. Cmwlth. 2016)).

[14] *Id.* ¶ 62.

[15] *Id.* ¶ 71 (citing 24 Pa.C.S. § 8327.1(a)(2)).

[16] PSERB additionally asserted in its preliminary objections that PSEA's claims were not ripe, and PSBA asserted that PSEA's claims were impermissible because PSEA has no private right of action to enforce Section 8327.1 and because its claims failed to state a viable cause of action. Because the Commonwealth Court ultimately dismissed PSEA's action on standing grounds, it dismissed these preliminary objections as moot.

The Commonwealth Court correctly set forth the requirements to establish standing, noting that a party must be "aggrieved" in order to have standing to pursue a claim, and that Pennsylvania courts apply the "substantial, direct, and immediate" test to measure the adequacy of the party's interest. Quoting the traditional formulation of this standard, the Commonwealth Court explained:

> A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.[17]

The court further noted that Pennsylvania jurisprudence "permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options," but the court found this rationale inapplicable to the instant dispute.[18] Instead, the Commonwealth Court concluded that PSEA lacked standing on the traditional criteria.

The court opined that "PSEA has not shown that it, its members, or its local affiliates have a substantial, direct, and immediate interest in *PSERB's* action, or, in this instance, inaction to establish the standing required to bring this action."[19] The gravamen of PSEA's claim, the court reasoned, was that the inability to determine whether subcontracting triggers withdrawal liability hampers a union's ability to effectively bargain with the public school district *employers*. PSEA directed its declaratory judgment action at PSERB, but it was actually designed "to aid PSEA, and its local affiliates, in their

---

[17]     *PSEA*, slip op. at 9 (quoting *Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014)).

[18]     *Id.* at 9-10 (quoting *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 924 (Pa. 2013)).

[19]     *Id.* at 14 (emphasis in original).

relationship and transactions with *school district employers*."[20]  This was problematic, in the Commonwealth Court's view, under this Court's 1939 decision in *Petition of Capital Bank & Trust Co.*, which the court cited for the proposition that a "declaratory judgment is not to resolve remote questions or to aid a party in a different transaction."[21]

The harm that PSEA asserted, the court continued, was "the subcontracting of bargaining unit work," which was "not the immediate or direct result of the challenged action of PSERB, but of the school district employers' decisions."[22]  Further, PSEA had acknowledged that a school district could still choose to subcontract even if PSERB were to impose withdrawal liability in connection with that decision.  Because "PSERB's decision may not affect the ultimate decision of a school district to subcontract bargaining unit work," the Commonwealth Court opined, PSEA's interest in PSERB's Resolution was "not direct or immediate," and there was "a lack of causal connection between the harm and the challenged action."[23]  Moreover, the court reasoned, the fact that PSERB will not render a preliminary decision on the amount of withdrawal liability in a particular situation "does not prevent PSEA from bargaining over subcontracting," because Section 8327.1(c) sets forth the formula for calculating withdrawal liability, so the union can do its own approximation of the withdrawal liability that it believes will apply to a given subcontracting decision and use that number in its negotiations.[24]  Finally, the Commonwealth Court concluded that PSEA could not assert standing on behalf of its

---

[20]    *Id.* at 14-15 (emphasis in original).

[21]    *Id.* at 15 (citing *Petition of Cap. Bank & Tr.*, 6 A.2d 790, 792 (Pa. 1939)).

[22]    *Id.*

[23]    *Id.*

[24]    *Id.*

individual employee members on the basis of their interests in their pension benefits, concluding that PSEA did not adequately allege any harm to those interests.

Having concluded that PSEA failed to demonstrate the requisite "substantial, direct, and immediate" interest necessary to establish its standing to challenge PSERB's Resolution, the Commonwealth Court sustained PSERB's and PSBA's preliminary objections to that effect and dismissed PSEA's action. The court accordingly dismissed PSERB's and PSBA's remaining preliminary objections as moot.

PSEA appealed the Commonwealth Court order to this Court. PSEA raises three issues. In addition to challenging the Commonwealth Court's conclusion that it lacked standing, PSEA argues that PSERB's and PSBA's outstanding, unaddressed preliminary objections lacked merit, and further asserts that it is entitled to the declaratory relief that it sought below.[25] We heard argument on September 12, 2023, limited to the issue of standing. Given our disposition, our discussion is similarly limited to that issue.

---

[25] Specifically, PSEA seeks review of the following questions, as stated in PSEA's brief:

1. Do the well-pled material facts of the Amended Petition establish that PSEA has a substantial, direct, and immediate interest, and therefore standing, to challenge the PSERS Board's refusal to apply the withdrawal provisions of Section 8327.1 of the Public School Employees' Retirement Code, 24 Pa.C.S. § 8327.1, to subcontracting?

2. Do the well-pled material facts of the Amended Petition establish that PSEA has set forth a legally sufficient claim for declaratory relief alleging that Resolution 2021-08 was an *ultra vires* action?

3. Do the well-pled material facts of the Amended Petition establish that PSEA has set forth a legally sufficient claim for declaratory relief alleging that the PSERS Board violates the mandatory withdrawal liability provisions of the Retirement Code when it refuses to impose withdrawal liability on school districts that cease contributing to PSERS for some of their school employees by subcontracting their work to private contractors who are not participating employers in PSERS?

PSEA's Br. at 3-4.

## II. Parties' Arguments

With regard to its standing, PSEA contends that it meets the traditional requirements explicated in this Court's oft-cited decision in *William Penn Parking Garage*,[26] *i.e.*, the demonstration of an interest in the subject-matter of the litigation that is "substantial," "direct," and "immediate." PSEA's interest is substantial, it asserts, because a school district's decision to subcontract work performed by union members is a significant and common issue raised in collective bargaining—subcontracting is often contested because it can result in the loss of jobs and the termination of the benefits of public employment. PSEA suggests that its interests in the financial consequences of subcontracting, and in negotiating over such decisions, exceed those of the public at large. PSEA's interest is direct, it argues, because PSERB's asserted failure to implement Section 8327.1 is causally connected to the harm that PSEA alleged. That harm is a union's "inability to know the true potential cost of subcontracting" when negotiating with a school district, and, consequently, its inability to "fulfill its legal obligation to bargain when school districts propose to outsource bargaining unit work."[27] PSEA stresses that a school district is obligated to inform the union of the projected cost-savings of a subcontracting decision, that the union must be given a chance to determine if it can match those savings, and that, due to PSERB's Resolution stating that it will not apply Section 8327.1 to subcontracting, "PSEA's local associations are unable to effectively factor in the potential cost of withdrawal liability to determine whether, how much, or if subcontracting will actually result in lower costs to the employing district."[28] Thus, PSEA asserts a causal connection between the Resolution and the alleged harm.

---

[26]    *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975).

[27]    PSEA's Br. at 19.

[28]    *Id.* at 21.

Because that causal connection is neither remote nor speculative, PSEA contends that its interest in the litigation is immediate. Indeed, PSEA avers that the Resolution already has harmed three local unions in their negotiations with school districts.

In the alternative, PSEA contends that its standing may be established through a "zone of interests" analysis. This theory, PSEA summarizes, asks whether "the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question."[29] PSEA suggests that it falls within the zone of interests protected by Section 8327.1 because the General Assembly presumptively was aware of collective bargaining obligations when it enacted Section 8327.1, and because the Code generally addresses matters that relate to subjects of collective bargaining. Finally, PSEA argues, recent decisions of this Court, particularly *Firearm Owners Against Crime v. Papenfuse*,[30] signal a trend toward relaxation of standing requirements in declaratory judgment actions. To the extent that its standing is in doubt, PSEA believes that it should benefit from this liberalization of standing doctrine.

PSERB, by contrast, characterizes PSEA's action as premised upon "potential harm caused by another entity, *i.e.*, school district employers."[31] PSERB endorses the Commonwealth Court's conclusion that PSEA's asserted harm is subcontracting, itself, and that its interest is not direct or immediate because the application of Section 8327.1 does not directly control whether a school district ultimately decides to subcontract. PSERB portrays the dispute as "between school districts and unions over subcontracting, entirely separate and apart from PSERB's actions with respect to withdrawal liability."[32]

---

[29]     *Id*. at 23 (quoting *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 249 A.3d 598, 605 (Pa. Cmwlth. 2021)).

[30]     *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467 (Pa. 2021) ("*FOAC*").

[31]     PSERB's Br. at 5.

[32]     *Id.* at 9.

PSERB stresses that it is not involved in negotiations over subcontracting, and it makes no decisions about subcontracting in any school district. It further stresses that withdrawal liability under Section 8327.1 is not calculated until *after* an employer is deemed to be nonparticipating, and that PSEA has no right to a "predetermination" of withdrawal liability in any particular case.[33] PSERB further argues that PSEA is not entitled to the benefit of any purported relaxation of standing requirements suggested by decisions like *FOAC*, stressing that PSEA is not in the "equally unappealing options" scenario discussed in *FOAC* or *Robinson Township*.[34]

Turning to PSEA's stated argument—that the asserted harm is a union's inability to effectively bargain over subcontracting decisions due to the Resolution—PSERB endorses the Commonwealth Court's reliance upon *Petition of Capital Bank & Trust Co.* for the proposition that a party cannot obtain a declaratory judgment in order to aid it in another transaction.[35] To the extent that the asserted harm is the deprivation of knowledge of whether subcontracting will trigger withdrawal liability, PSERB suggests that this is merely a pretext for PSEA's actual goal—preventing subcontracting.[36] Moreover, PSERB suggests that unions can make their own estimates of withdrawal liability under the formula set forth in Section 8327.1(c). Thus, PSERB argues, if the asserted harm is a lack of information, the union can inform itself by performing its own calculation.

---

[33]  *Id.* at 13.

[34]  *Id.* at 15-16 (discussing *FOAC*, 261 A.3d 467; *Robinson Twp.*, 83 A.3d 901).

[35]  *Id.* at 16 (citing *PSEA*, slip op. at 15; *Petition of Cap. Bank & Tr.*, 6 A.2d at 792).

[36]  *Id.* at 17 ("PSEA does not want to bargain simply for the sake of bargaining; it wants to prevent subcontracting (should it arise) at future bargaining tables. PSEA only seeks to use PSERB to tip the scales of the negotiations and convince employers not to subcontract.").

PSERB also stresses that the application of Section 8327.1 does not impact the retirement benefits of individual members; instead, the statute was designed to relieve a financial burden upon *employers* who participate in the System. For this same reason, PSERB argues that PSEA does not fall within the zone of interests that Section 8327.1 was designed to protect. PSERB finds no indication that the General Assembly meant for Section 8327.1 to do anything other than securing funding for the System. In any event, PSERB maintains that the imposition of withdrawal liability upon a nonparticipating employer does not affect the benefits of individual members, which are determined by a specific statutory formula. Thus, PSERB argues, no individual participant in the System is aggrieved by the Resolution, and PSEA, by extension, similarly lacks standing.

PSBA's argument is largely repetitive of PSERB's with regard to PSEA's standing. PSBA likewise emphasizes that Section 8327.1 was designed to protect the System and employers who participate in it, and that it was not meant to aid unions in collective bargaining. Any harm arising from PSERB's refusal to apply the statute to subcontracting decisions, PSBA asserts, is merely "potential and indirect."[37] Like PSERB, PSBA suggests that unions can make their own calculations of withdrawal liability under Section 8327.1(c) and use that figure in their negotiations. It insists that PSEA's dispute is with school district employers, not with PSERB. And because Section 8327.1 was designed to ease the financial burdens placed upon those employers, and not to aid PSEA or its affiliated unions in collective bargaining, PSBA argues that PSEA is not within the zone of interests sought to be protected by the statute. PSBA likewise reiterates the Commonwealth Court's reliance upon *Petition of Capital Bank & Trust Co.* Finally, PSBA

---

[37] PSBA's Br. at 11; *see id.* at 19 ("[The] 'causal connection' between the alleged harm asserted by PSEA and the complained of actions of PSERB in terms of Section 8327.1 is tenuous, speculative, indirect and remote.").

echoes PSERB's argument that a *FOAC* rationale does not apply because PSEA is not in a position where it must choose between legally untenable options.

## III. Discussion

The question of whether a petitioner has standing "presents a question of law, over which our standard of review is *de novo* and our scope of review is plenary."[38] As the matter arises on preliminary objections, however, we accept all well-pled material facts averred in the petition as true, and "we will affirm an order sustaining preliminary objections based on standing only if the [petitioner] is clearly not entitled to relief as a matter of law."[39]

Standing is a justiciability concern—a threshold requirement that must be established "[p]rior to judicial resolution of a dispute."[40] Although the standing doctrine is prudential in this Commonwealth and not a question of jurisdiction,[41] our courts nevertheless maintain a commitment to ensuring that the judiciary's involvement in a dispute is warranted. Such "judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract."[42] To that end, the standing

---

[38] *FOAC*, 261 A.3d at 476 (citing *Robinson Twp.*, 83 A.3d at 917).

[39] *Id.*

[40] *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 659 (Pa. 2005) (citing *Bergdoll v. Kane*, 731 A.2d 1261, 1268 (Pa. 1999)).

[41] *See, e.g.*, *Robinson Twp.*, 83 A.3d at 917 ("In contrast to the federal approach, notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate, do not involve a court's jurisdiction, and are regarded instead as prudential concerns implicating courts' self-imposed limitations.").

[42] *City of Philadelphia v. Commonwealth*, 838 A.2d 566, 577 (Pa. 2003) (citing *In re Hickson*, 821 A.2d 1238, 1243 (Pa. 2003)).

doctrine protects against "improper plaintiffs"[43] by preventing litigation by "a person who is not adversely impacted by the matter he seeks to challenge."[44]

"Stated another way, a controversy is worthy of judicial review only if the individual initiating the legal action has been 'aggrieved.'"[45] A party "who is not negatively affected by the matter he seeks to challenge is not aggrieved, and thus, has no right to obtain judicial resolution of his challenge."[46] "This principle is based upon the practical reason that unless one has a legally sufficient interest in a matter, that is, is 'aggrieved,' the courts cannot be assured that there is a legitimate controversy."[47] As noted above, we assess whether a party is "aggrieved" through a three-part inquiry. An "individual can demonstrate that he is aggrieved if he can establish that he has a substantial, direct, and immediate interest in the outcome of the litigation."[48] As traditionally framed:

> A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.[49]

---

[43] *FOAC*, 261 A.3d at 481 (citing *In re Application of Biester*, 409 A.2d 848, 851 (Pa. 1979)).

[44] *Pittsburgh Palisades Park*, 888 A.2d at 659 (quoting *William Penn Parking Garage*, 346 A.2d at 280-81).

[45] *Id.* (citing *In re Hickson*, 821 A.2d at 1243).

[46] *City of Philadelphia*, 838 A.2d at 577 (citing *Pa. Game Comm'n v. Dep't of Envtl. Res.*, 555 A.2d 812, 815 (Pa. 1989); *Zemprelli v. Daniels*, 436 A.2d 1165, 1168 (Pa. 1981)).

[47] *Pittsburgh Palisades Park*, 888 A.2d at 659-60 (citing *In re Hickson*, 821 A.2d at 1243; *City of Philadelphia*, 838 A.2d at 577).

[48] *Id.* at 660.

[49] *FOAC*, 261 A.3d at 481 (quoting *Donahue*, 98 A.3d at 1229).

PSEA's averments easily establish the traditional requisites of a substantial, direct, and immediate interest in the outcome of its challenge to PSERB's Resolution. Most of the arguments to the contrary are premised upon patent mischaracterizations of PSEA's position. PSERB's and PSBA's arguments are rife with assertions that PSEA's "true" or "actual" harm is subcontracting, itself, and that its "true" dispute, thus, is with school districts that engage in subcontracting rather than with PSERB.[50] The suggestion slyly distances PSERB from the matter, asking us to ignore the downstream consequences of the Resolution. PSEA has been quite clear, in both its pleading and its briefing, that the harm it alleges from PSERB's Resolution is a hindrance to a union's *ability to effectively negotiate* over subcontracting decisions, because the Resolution has created a mismatch between the relevant parties' understandings of when Section 8327.1 applies.

It is helpful to illustrate the problem. Suppose that a school district is considering subcontracting the work of employees, who are members of a PSEA-affiliated union, because it expects to save money thereby. No one disputes PSEA's characterization of the legal obligations of the parties, specifically that the school district must give the union

---

[50] *See, e.g.*, PSERB's Br. at 5 ("PSEA does not seek knowledge for the sake of knowledge; it seeks knowledge to use in collective bargaining negotiations to persuade employers not to subcontract, which is the true harm it seeks to avoid."), 8 ("PSEA's true harm is not a lack of information at the bargaining table, but rather, subcontracting."), 9 ("PSEA does not have standing because its true alleged harm is caused by school districts deciding to subcontract, not by PSERB."), 14 ("PSEA's true dispute is not with, or caused by, PSERB, PSERS, or the Retirement Code; PSEA's dispute is with the school districts in Pocono Mountain, Shikellamy, and Port Allegany."), 17 ("The lack of information is only allegedly harmful because PSEA desires that information to attempt to dissuade school district's [*sic*] from causing the actual alleged harm, *i.e.*, the subcontracting."); PSBA's Br. at 18 ("In short, PSEA's true dispute is not with, or caused by PSERB, it is with the employers who seek to contract out bargaining unit work.").

The Commonwealth Court mischaracterized PSEA's averments in a similar manner. *See PSEA*, slip op. at 15 ("The harm PSEA asserts, the subcontracting of bargaining unit work . . . is not the immediate or direct result of the challenged action of PSERB, but of the school district employers' decisions.").

an opportunity to attempt to match the expected cost-savings that would be achieved through subcontracting. The union, based upon its understanding of Section 8327.1(a)(2), believes that the subcontracting decision will trigger the imposition of withdrawal liability, will increase the costs to the school district, and therefore will make subcontracting less attractive. This, on the union's account, would make it easier for it to match or exceed the expected cost-savings, and, thus, to dissuade the school district from subcontracting the union members' work. The school district, by contrast, could point to PSERB's Resolution, which states that PSERB does not intend to apply Section 8327.1 to subcontracting decisions, at least "[i]n the interim."[51] Thus, on the school district's account, there will be no withdrawal liability, and its costs will be significantly lower than the union asserts.

Right at that moment, the union has a problem. The parties are not working with the same numbers. Because they are not on the same page, they are unable to negotiate effectively. The parties are proverbially comparing apples to oranges; except, in this circumstance, apples are categorically cheaper, making matters rather difficult for the advocate of oranges. That mismatch in the parties' expectations about Section 8327.1 is directly attributable to the Resolution. Absent the Resolution, the parties might still disagree about the applicability of Section 8327.1, but the school district would not be able to rely upon PSERB's declaration that it does not intend to apply Section 8327.1 to subcontracting scenarios—a determination that PSEA believes to be impermissible under the language of the statute.

This illustration further demonstrates that many of PSERB's and PSBA's other arguments similarly rely upon mischaracterizations of PSEA's position. PSEA is not asserting a right to receive a "predetermination" of withdrawal liability in any particular

---

[51]     *See supra* n.6.

case, nor is it seeking to prevent any particular subcontracting decision through its declaratory judgment action. PSEA, rather, is seeking to challenge PSERB's Resolution due to its alleged misinterpretation of a statute that will impact labor negotiations. PSEA merely seeks a declaration that Section 8327.1 *can* apply to subcontracting in a manner that triggers withdrawal liability, so that the union may have a fair opportunity to compete with a subcontracting proposal. As things stand, the union is in an inferior bargaining position, which is directly attributable to the Resolution. It is immaterial, moreover, that withdrawal liability would not be calculated until after a subcontracting decision is made, and this does not render PSEA's asserted harm "speculative" or "potential." The harm asserted occurs *before* the decision is made, *i.e.*, the harm occurs during the negotiation process, when the school district uses the Resolution to devalue, if not wholly disregard, the union's counter-proposal. For this same reason, whether a union can perform its own calculation of estimated withdrawal liability under Section 8327.1(c) is irrelevant. The school district, again, can merely cite the Resolution, safely conclude that withdrawal liability will not be imposed (at least "[i]n the interim"), and consequently determine that the union's calculation is worthless.

Simply assessing the harm that PSEA actually alleges, rather than diversions about its supposedly "true" harm, reveals that the Resolution is the cause of the harm that PSEA describes. Framed in the language of our standing jurisprudence, PSEA is "aggrieved" by the Resolution. PSEA's interest in challenging the Resolution is "substantial" because it far exceeds the interest of the public at large in the correct application of Section 8327.1.[52] The ordinary citizen has little to no interest in the financial consequences of a school district's decision to subcontract the bargaining unit work of its

---

[52] *See In re Hickson*, 821 A.2d at 1243 ("A 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law.") (citing *Bergdoll*, 731 A.2d at 1261).

employees, or whether the school district will be required to pay additional funds into PSERS as a result of that decision. PSEA and its affiliated unions, by contrast, are interested in the matter due to its impact upon the union's negotiating position. PSEA's interest is "direct" because, as established above, the Resolution is causally connected to the asserted harm to the union's ability to effectively bargain over subcontracting decisions.[53] The Resolution is the reason for the mismatch in the parties' understandings of when Section 8327.1 applies. If PSEA's view of the statute is correct, then school districts, relying upon the Resolution, are premising subcontracting decisions upon an inaccurate assessment of the potential cost-savings, placing the union in a materially inferior negotiating position.[54] Finally, PSEA's interest is "immediate" because the causal connection between the Resolution and the asserted harm is real and concrete, not "remote or speculative."[55] Indeed, according to PSEA's factual averments (which must be accepted as true when considering preliminary objections) the Resolution already has harmed local unions' interests in negotiations over subcontracting decisions in the Pocono Mountain, Shikellamy, and Port Allegany school districts.

These averments establish a substantial, direct, and immediate interest sufficient to warrant a request for the sort of remedy that a declaratory judgment action seeks—a clarification of the law to resolve a dispute between interested parties over its meaning.

---

[53] *See Pittsburgh Palisades Park*, 888 A.2d at 660 ("[A] 'direct' interest mandates a showing that the matter complained of 'caused harm to the party's interest,' *i.e.*, a causal connection between the harm and the violation of law.") (citation omitted) (quoting *In re Hickson*, 821 A.2d at 1243).

[54] To be clear, we offer no opinion at this juncture as to whether Section 8327.1, in fact, applies to subcontracting in the abstract or in any particular instance. The question of PSEA's standing is merely a determination of whether PSEA may bring its challenge in the first place.

[55] *See id.* ("[A]n interest is 'immediate' if the causal connection is not remote or speculative.") (citing *City of Philadelphia*, 838 A.2d at 577; *Kuropatwa v. State Farm Ins. Co.*, 721 A.2d 1067, 1069 (Pa. 1998)).

A demonstration of standing requires no more. Nonetheless, the parties have addressed a number of specific theories that courts may consider when assessing challenges to a party's standing, and which might be viewed as particular ways of establishing a legally cognizable injury. None of these alternative theories bear upon our decision today, but the parties' arguments nonetheless raise points that are worthy of discussion and emphasis. For instance, PSERB and PSBA argue that PSEA does not fall within the "zone of interests" sought to be protected by Section 8327.1, because that statute is designed to secure adequate funding of PSERS and to protect the financial interests of employers who participate therein, not to aid unions in collective bargaining. This may well be true, but it does not defeat PSEA's standing. As in previous cases:

> [W]e reiterate what has been stated before: in Pennsylvania, a party must be aggrieved in order to possess standing to pursue litigation. Aggrievability is obtained by having a substantial, direct, and immediate interest in proceedings or litigation. When the standards for substantiality, directness, and immediacy are readily met, the inquiry into aggrievability, and therefore standing, ends.[56]

A "zone of interests" analysis may be employed where a party's immediate interest is *not* apparent, but it is "merely a guideline that may be used to find immediacy," not an "absolute test."[57] Because PSEA's interest readily meets the traditional requirements, PSEA has standing. No further inquiry is necessary.

This underscores a point woven through much of PSERB's and PSBA's arguments—that Section 8327.1, on its face, concerns the duties of *employers*, not of PSEA or its affiliated unions. Thus, the argument goes, PSEA is uninterested in its application. This is a misapplication of the doctrine of standing. It is not disqualifying that the statute in question imposes an obligation upon the employer, and not the union, when

---

[56]     *Johnson v. Am. Standard*, 8 A.3d 318, 333 (Pa. 2010).

[57]     *Id.* at 333-34.

the union nonetheless is affected by PSERB's interpretation and application of the statute. The consequences of a statute, or an agency's interpretation of that statute, can extend to others beyond those expressly targeted. Although PSERB and PSBA may correctly identify the zone of interests that Section 8327.1 was designed to protect, this is no barrier to PSEA's ability to establish that it is aggrieved by PSERB's application of the statute.

The parties additionally have addressed the rationale that we have applied in decisions such as *FOAC* and *Robinson Township*, which, under certain circumstances, allow a party to seek a pre-enforcement declaratory judgment without placing itself in the untenable position of having to violate the law in order to challenge it.[58] All parties agree that PSEA is not in the sort of circumstance that would implicate this reasoning. Regardless, PSEA suggests that cases such as *FOAC* represent a trend toward relaxing standing requirements in declaratory judgment cases, from which it should benefit. In our view, PSEA requires no such assistance, because its standing is clear under the traditional criteria. Although we offer no characterization of recent trends in standing jurisprudence, it is always worthwhile to stress, as *FOAC* did, the breadth of the remedy contemplated by the Declaratory Judgments Act,[59] and to note that complainants always should receive the benefit of doubt when their actions are challenged by preliminary objections. Such objections may be sustained only where it is clear and free from doubt that the complainant is not entitled to relief as a matter of law.[60]

All of these considerations converge in our analysis of the final point of discussion. The most plausible argument against PSEA's standing lies in the Commonwealth Court's

---

[58]    *See Robinson Twp.*, 83 A.3d at 923-25; *FOAC*, 261 A.3d at 482-91 (discussing case law developing this aspect of standing jurisprudence).

[59]    *See FOAC*, 261 A.3d at 490.

[60]    *See id.* at 476 (citing *Robinson Twp.*, 83 A.3d at 917).

citation of this Court's 1939 decision in *Petition of Capital Bank & Trust Co.* for the proposition that parties "are not entitled to a declaratory judgment on remote questions, *or to aid them in another transaction.*"[61] Like much of PSERB's and PSBA's arguments, the supposed significance of this proposition is premised upon PSEA's motives rather than its averments, *i.e.*, that PSEA actually seeks to avoid its purportedly "true" harm of subcontracting, itself. Nevertheless, we will assume, *arguendo*, that PSEA's clear interest in negotiations with school districts over subcontracting decisions implicates the above-quoted statement. Significantly, prior to the Commonwealth Court's decision in the instant case, no appellate court has cited *Petition of Capital Bank & Trust Co.* for the relevant proposition since this Court issued that decision in 1939. There is good reason for its moribundity.

*Petition of Capital Bank & Trust* predates the enactment of the modern Declaratory Judgments Act by nearly forty years. Nothing in the Declaratory Judgments Act purports to deny a party access to a declaratory judgment merely because the party is interested in another transaction. Indeed, the Act would seem to contradict this proposition. Section 7532 of the Declaratory Judgments Act states that courts "shall have power to declare rights, status, and other legal relations *whether or not further relief is or could be claimed.*"[62] Section 7533, moreover, grants persons who are interested in a deed, will, or contract the right to seek a declaratory judgment on the meaning of laws that affect their rights under those documents.[63] The fact that those documents reflect the person's

---

[61] *Petition of Cap. Bank & Tr. Co.*, 6 A.2d at 792 (emphasis added); *see PSEA*, slip op. at 15.

[62] 42 Pa.C.S. § 7532 (emphasis added).

[63] *Id.* § 7533 ("Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, (continued…)

interest in another transaction is no barrier to relief. [64]  Moreover, under Section 7536, the fact that particular classes of declaratory remedies are specifically enumerated "does not limit or restrict the exercise of the general powers . . . where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty."[65]

As we stated in *FOAC*:  "There is no basis to constrain the power granted by the Declaratory Judgments Act."[66]  "The Declaratory Judgments Act gives courts the 'power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.'  The Act refers to the 'rights, status, and other legal relations' without qualification . . . ."[67]  To the extent that *Petition of Capital Bank & Trust Co.*'s declaration was ever an accurate statement of the law of declaratory judgments, we conclude that it is inconsistent with the current iteration of the Declaratory Judgments Act, and has been superseded thereby.  Accordingly, the fact that PSEA and its affiliated unions have an interest in negotiations with school districts does not preclude PSEA from establishing standing to challenge the Resolution, due to the harm that the Resolution causes to its

---

contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder.").

[64]    We note, however, that Section 7540(a) specifies that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."  42 Pa.C.S. § 7540(a).  Because our decision only concerns PSEA's standing, we offer no opinion as to whether the declaration that PSEA seeks may impact the interests of any other party pursuant to Section 7540(a) of the Declaratory Judgments Act.  It is conceivable that, for example, school districts may be deemed to have an interest in the matter as great as PSEA and its local union affiliates, either individually or in the aggregate.  Whether any such parties may be deemed to be indispensable, or whether the participation of PSBA in this litigation is adequate to represent such interests, are questions beyond the scope of our decision today.

[65]    42 Pa.C.S. § 7536.

[66]    *FOAC*, 261 A.3d at 490.

[67]    *Id.* (quoting 42 Pa.C.S. § 7532).

position in such negotiations. Because PSEA has established the requisite "substantial, direct, and immediate" interest in the outcome of this litigation, the inquiry into its standing is complete.[68]

## IV. Conclusion

Because the Commonwealth Court ruled solely upon standing and we reverse on that basis, we need not address PSEA's arguments concerning the preliminary objections that the court dismissed as moot, nor the merits of the declarations that PSEA seeks. We conclude only that PSEA is aggrieved by PSERB's Resolution to a degree sufficient to entitle it to make its case in court.

We reverse the order of the Commonwealth Court, and remand without prejudice to any preliminary objections dismissed as moot, or which are otherwise available by law.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy and Brobson join the opinion.

---

[68] *Johnson v. Am. Standard*, 8 A.3d at 333 ("When the standards for substantiality, directness, and immediacy are readily met, the inquiry into aggrievability, and therefore standing, ends.").